# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                  No. CR 09-0312 JB

KALVEST GANADONEGRO,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the United States' Sealed Motion to Exclude Expert Testimony of Samuel Roll, filed February 15, 2011 (Doc. 101)("Motion").  The Court held an evidentiary hearing on May 13, 2011.  The primary issues are: (i) whether Dr. Samuel Roll's report is reliable; (ii) whether Dr. Roll's proposed testimony is irrelevant and infringes on the jury's province to determine the facts and assess credibility; and (iii) whether, if the Court finds that Dr. Roll's testimony is admissible pursuant to rule 702 of the Federal Rules of Evidence, it should exclude the testimony on the grounds that the alleged unfair prejudice Plaintiff United States of America would suffer as a result of its admission substantially outweighs any probative value Defendant Kalvest Ganadonegro would gain by its introduction.  The Court will grant in part and deny in part the United States' motion.  The Court finds that at least some of Dr. Roll's testimony is reliable.  It finds that Dr. Roll's testimony, insofar as it goes to the credibility of Ganadonegro's statements in an interview with law enforcement officers, is irrelevant.  The Court will thus exclude Dr. Roll's testimony regarding the credibility of Ganadonegro's statements.  The Court finds that Dr. Roll's testimony, insofar as it relates to the voluntariness of Ganadonegro's statements in an

interview with the law enforcement officers, is relevant.  Because the danger of unfair prejudice to the United States does not substantially outweigh the probative value of Dr. Roll's testimony relating to the voluntariness of Ganadonegro's statements, the Court will not exclude this limited testimony.

## **FACTUAL BACKGROUND**

This case arises out of the death of a nearly ten-month-old baby, Q.S., who died while in Ganadonegro's care on November 21, 2008.  See Motion at 1; Defendant's Sealed Response to the United States' Sealed Motion to Exclude the Testimony of Dr. Samuel Roll at 2, filed March 18, 2011 (Doc. 105)("Response").  On November 22, 2009, law enforcement officers interviewed Ganadonegro.  See Motion at 1; Response at 2.  During the interview, Ganadonegro stated:

> KALVEST GANADONEGRO: She was just sitting there first, and then I was playing with my son, and then all of a sudden she just started crying.  She wanted me to pick her up.
>
> DETECTIVE BEN: Okay.
>
> KALVEST GANADONEGRO: And I picked her up, and she still . . . she still was crying.
>
> DETECTIVE BEN: Okay.
>
> KALVEST GANADONEGRO: She . . . and then at the same time, my friend was over here crying at me.
>
> DETECTIVE BEN: Okay.
>
> KALVEST GANADONEGRO: I told my son, "Wait, I've got to take care of [Q.S.]" And I was carrying her around, and then she couldn't stop crying, so I tried giving her a bottle, and I tried giving her food or candy.
>
> DETECTIVE BEN: Mmm hmm.
>
> KALVEST GANADONEGRO: And then after that, I kind of shook her.  I shook her like this.  I told her, "[Q.S.], please stop crying."

-2-

UNIDENTIFIED DETECTIVE: Was it . . . but it sounds like you were . . . you got very . . . you were very frustrated.

KALVEST GANADONEGRO: Yeah.  I went like that.

DETECTIVE BEN: Okay, so this was . . . .

KALVEST GANADONEGRO: Her head went . . . her head popped back.

DETECTIVE BEN: Kalvest, this . . . I don't think you were . . . you've been very frustrated with a lot of different things probably going on at home.  Right?

KALVEST GANADONEGRO: Yeah.

. . . .

DETECTIVE BEN: But Kalvest . . . I know you didn't Kalvest.  But hear me out. Okay?  Okay?  Tell me how many times you shook her.

KALVEST GANADONEGRO:  I shook her like three times.  Like kind of hard thrusts.

Transcript of Kalvest Ganadonegro Interview at 51:2-52:3, 56:4-5 (taken November 22, 2009), filed April 7, 2011 (Doc. 112-1).  One of the detectives asked Ganadonegro "[a]nd she continued crying?" Tr. of Ganadonegro Interview at 56:15-16.  Ganadonegro responded: "Yeah.  And I tried telling her, 'Don't . . . please stop crying.' . . . When I picked her back up . . . I said, 'Stop crying [Q.S.]' I shook her again . . . once again, like that.  And then I sat her down like this, and she fell back and hit the board."  Tr. of Ganadonegro Interview at 56:17-24.

## PROCEDURAL BACKGROUND

On February 11, 2009, a federal grand jury charged Ganadonegro with first-degree murder pursuant to 18 U.S.C. §§ 1111(a) and (c)(3) and 1153.  See Doc. 30.  On July 10, 11, and 25, 2009, Dr. Roll conducted a psychological evaluation of Ganadonegro.  See Psychological Report, filed February 15, 2011 (Doc. 101-1).  Dr. Roll evaluated Ganadonegro to clarify his "mental status, especially with respect to the presence, if any, of personality features that would make him

susceptible to making false admissions." Psychological Report at 1. In his Psychological Report, Dr. Roll lists several of Ganadonegro's personality features that would increase the probability of false admissions, including Ganadonegro's low verbal skills, his difficult time with language, his low estimate of his personal worth, low self-esteem, limited self-confidence, his deficit in attention and in concentration, his demonstration of impairment of reality testing capacities, and his susceptibility to episodes of depression. Dr. Roll concluded that "[t]here are a host of language factors, cultural factors, and personality factors that would have increased the probability of . . . Ganadonegro making false admissions." Psychological Report at 3. He stated: "Only an interview with the situational factors ameliorated and his personality dispositions taken into account could produce any reliable patter of admissions on his part." Psychological Report at 3.

On December 2, 2009, Ganadonegro filed a Notice of Intent to Offer Expert Testimony. See Doc. 58 ("Notice"). Ganadonegro provided notice that he intends to introduce the expert testimony of Dr. Roll during his case-in-chief at trial. Ganadonegro asserts that Dr. Roll is a licensed forensic psychologist and professor emeritus of psychology at the University of New Mexico. Ganadonegro anticipates "Roll will testify to his evaluation of . . . Ganadonegro and to . . . Ganadonegro's verbal abilities, level of intelligence, and personality structure that make him particularly susceptible to false confessions and vulnerable to suggestion." Notice at 1.

On February 15, 2011, the United States filed the United States' Sealed Motion to Exclude Expert Testimony of Samuel Roll. See Doc. 101. The United States moves the Court to exclude the expert testimony of Dr. Roll -- a defense witness. The United States argues that Dr. Roll's testimony is irrelevant and improper under rule 702 of the Federal Rules of Evidence and under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993). The United States further argues that, even if the Court finds that Dr. Roll's testimony is admissible under rule 702, it should

-4-

nevertheless exclude the testimony pursuant to rule 403, because the danger of unfair prejudice to the United States substantially outweighs any nominal probative value the testimony may have.

On March 18, 2011, Ganadonegro filed the Defendant's Sealed Response to the United States' Sealed Motion to Exclude the Testimony of Dr. Samuel Roll. See Doc. 105. Ganadonegro argues that the Court should deny the United States' motion, because Dr. Roll's expert opinion is relevant and reliable, because it is based on generally accepted psychological principles, and because it is essential to Ganadonegro's Sixth Amendment right to present a complete defense.

On April 7, 2011, the United States filed the United States' Reply in Support of its Sealed Motion to Exclude Expert Testimony of Samuel Roll. See Doc. 112. The United States argues that Ganadonegro is unable to provide any justification for the admission of Dr. Roll's report or testimony. It also argues that the exclusion of Dr. Roll's testimony would not violate Ganadonegro's Sixth Amendment right to present a defense.

At the hearing, Dr. Roll testified that he met Ganadonegro in July, 2009 to "do a psychological evaluation." Transcript of Hearing at 17:8-12 (taken May 13, 2011)(Pori, Roll)("Tr.").[1] He testified that, "in doing th[e] psychological evaluation, [he] gave [Ganadonegro] . . . a standard battery of psychological tests that consisted of . . . the Wechsler, which is an intelligence test that breaks intelligence down into about a dozen components . . .[,] the Wide Range Achievement Test which tests the ability to read . . . [,] the [Minnesota Multiphasic Personality Inventory ("MMPI")] and the Rorschach test." Tr. at 17:11-18 (Pori, Roll). Dr. Roll testified that all of the "tests a[re] generally accepted among forensic psychologists." Tr. at 17:19-21 (Pori, Roll). Dr. Roll also testified that all the tests are "subjected to peer review and analysis

---

[1] The Court's citations to the transcript are to the Court Reporter's original, unedited version. A final version of the transcript may have slightly different line or page numbers.

in learned journals," stating that the tests "have been published in peer re[viewed] j[ournal]s[,] have

had between hundreds and thousands of peer-reviewed articles and are accepted in the field of

psychology."  Tr. at 17:22-18:2.  Dr. Roll testified that the "tests have norms which would

demonstrate whether or not a person . . . is fa[k]ing or malingering or otherwise producing an[ ]

invalid response to the questions in the tests."[2] Tr. at 18:3-9 (Pori, Roll).  Dr. Roll testified that the

norm, called the validity scale,[3] was not applied, because Ganadonegro could not sufficiently

understand the MMPI, which is the test that employs the validity scale, but stated that there are

"measures on the Rorschach that indicate that the test is reliable and taken in a valid[ ] [manner] and

the inconsistency measures on the Wechsler that also indicate that the test was taken in a

straightforward manner."  Tr. at 18:19-19:3 (Roll).  Dr. Roll testified that, based on the tests,

Ganadonegro has low verbal skills, because the tests showed that his overall intelligence is in the

normal range -- he is in the forty-second percentile -- but that his verbal intelligence quotient

("I.Q.") is at the eighteenth percentile and his verbal comprehension is in the twelfth percentile.

See Tr. at 19:8-12 (Roll).  Dr. Roll further stated that, in the reading portion of the Wide Range

Achievement Test, Ganadonegro was at the twelfth percentile.  See Tr. at 20:1-3 (Roll).  Dr. Roll

testified that Ganadonegro's verbal skills are in the retarded area, but not his perceptual skills or his

motor skills.  See Tr. at 27:13-28:4 (Torrez, Roll).  Dr. Roll testified that the tests measured whether

Ganadonegro had a positive self-image or low self-esteem, and stated that the scores indicated that

he has a low sense of self-esteem and self-confidence.  See Tr. at 20:17-24 (Pori, Roll).  In the digit

_____

[2] Malingering is a term that refers to fabricating or exaggerating the symptoms of mental or physical disorders.  See Response at 8.

[3] A validity scale is a "scale that let[s] you know whether or not the person is taking the test in a fairly straightforward way."  Tr. at 18:11-13 (Roll).

span area -- which measures one's capacity to attend and recall temporally ordered elements in the correct order-- Ganadonegro scored a ninety, which is low normal -- and in verbal knowledge, he scored a sixty -- which is in the retarded area.  See Tr. at 30:4-16 (Torrez, Roll).  Dr. Roll testified that, in his evaluation of Ganadonegro's mental status, he found mental defects -- "[w]hen you have retarded attention span that's a defect[;] [w]hen you have depression that's a defect[;] [w]hen you have low self-concept that's a defe[]ct."  Tr. at 57:22-58:5 (Torrez, Roll).  Dr. Roll stated: "Everything I listed is a defect."  Tr. at 58:19 (Roll).  He stated: "One of the defects is in the DSM-IV and that's depression because the defect that matches what's in DC.  But every defect that a person can have . . . is not in the DMS-IV.").  DSM-IV is the diagnostic and statistical manual of mental disorders.

Based on his examination of Ganadonegro and the tests he administered to Ganadonegro, Dr. Roll concluded that Ganadonegro has low verbal skills, because, although his overall intelligence is in the forty-second percentile, his verbal I.Q. is at the eighteenth percentile and his verbal comprehension is in the twelfth percentile.  See Report at 1.  Dr. Roll also concluded that Ganadonegro has a low estimate of his personal worth and experiences low self-esteem and limited self-confidence.  See Report at 2.  Dr. Roll concluded that Ganadonegro has a deficient in attention and concentration, and that his capacity to coordinate and organize data, and weigh it for contradictions and consequences, falls below most people's skill level.  See Report at 2.  Dr. Roll concluded that Ganadonegro demonstrated impairment of reality-testing capacities in which he tends to misperceive events, and tends to form mistaken impressions of people and what their actions signify.  See Report at 2-3.  Dr. Roll also concluded that Ganadonegro is susceptible to episodes of depression.  See Report at 3.  Based on these conclusions, Dr. Roll concluded: "There are a host of language factors, cultural factors, and personality factors that would have increased the probability

of . . . Ganadonegro making false admissions.  Only an interview with the situational factors ameliorated and his personality dispositions taken into account could produce any reliable pattern of admissions on his part."  Report at 3.

At the hearing, the United States stated that it believed that the Court should exclude all of Dr. Roll's testimony and his report.  The Court stated that it appears the United States Court of Appeals for the Tenth Circuit is "saying, if you . . . stick to voluntariness you can bring [the expert testimony and report] in, but you just can't get into the credibility of the prior testimony or confession."  Tr. at 69:2-12 (Court).

> THE COURT: Given that, isn't there going to be some things that he can testify about that go to voluntariness.
>
> MS. ROZZONI:  Well, Your Honor, I guess that if there was a voluntariness issue shouldn't there be a motion made by the defendant that this statement in some way was not voluntary and therefore should be completely excluded? . . . .
>
> THE COURT:  Well not necessarily.  I mean, we let the jury determine that issue . . . at trial.  You have the burden of when you bring it in showing that it's [voluntary], so it's not necessarily something that they have to exclude.
>
> MS. ROZZONI:  Your Honor, I believe that this case fi[]ts squarely within [United States v. Adams, 271 F.3d 1236 (10th Cir. 2001)].
>
> THE COURT:  Well am I reading the cases right, though?  You quote which same [aspect] on page 7 of your moving papers.  You can let in expert testimony about voluntariness, but you've got to keep out expert testimony about credibility.  Is that do you agree with that line?
>
> MS. ROZZONI:  I do agree with . . . that line but I'll expand on that a little bit because I think that they make clear that you can talk about the circumstances of the interview, you can talk about the room in which it took place you can talk about the manner in which the statement was given.
>
> THE COURT: . . . [W]e're talking about expert testimony here.  The quote is stand only for the proposition that expert testimony regarding voluntariness of a confession is admissible when the expert will testify to the existence of the defendant's existence of identifiable medical disorder it raises a question regarding the defendant's cognitive voluntariness.

-8-

MS. ROZZONI:  Right but they are talking about an identifiable medical disorder which is how it's distinguished in [United States v. Adams] and in [United States v. Benally, 541 F.3d at 990 (10th Cir. 2008)], I believe, because here we have personality type factors, his verbal skills are low.  He is susceptible to depression.

. . . .

THE COURT:  Let's take low verbal skills.

MS. ROZZONI:  Sure is.

THE COURT:  Would you agree that low verbal skills can be a factor that goes to voluntariness?

MS. ROZZONI:  I suppose I would, Your Honor, but I don't know -- I think that the Tenth Circuit wants more than just low verbal skills when you have an expert coming in to testify to a jury about why or why not someone's statements are voluntary or not.  I think that's why they set the bar higher.

THE COURT:  Well, let's say that he has -- let's say that they bring in ten witnesses and all Dr. Roll's going to say, he's going to talk about low verbal skills.  Should I allow him to testify about low verbal skills?

MS. ROZZONI:  I don't think you should. . . .  I think the Tenth Circuit has set a bar that says he needs to have some cognizable recognizable diagnosed condition, such as the conditions that are at play in [United States v. Shay, 57 F.3d 126 (1st Cir. 1995)] and [United States v. Hall, 93 F.3d 1337 (7th Cir. 1996)].  You had diagnosed a man who is diagnosed with essentially [munchausen] disease.  He was he was a pathological liar.  He was diagnosed as a pathological liar, and that's why -- [United States v. Hall] actually lays out kind of an interesting analogy.  They talk about if, for instance, you were showing intent because someone uses foul language as a way of showing intent.  Well you can bring someone in to show that they had [Gilles de la Tourette's syndrome] that's why they would use the foul language it wasn't that they had the intent to harm the person.  In this case there is no cognizable diagnosed anything that he can only -- he plays around with personality factors.  There's nothing that anyone can grasp on to.

. . . .

MS. ROZZONI:  . . .  I'm saying that if he were diagnosed with a cognizable documented psychological disorder, which he is not, that somehow contributed to the voluntariness of his statement, I believe that that -- that the Tenth Circuit might think that that was okay under [United States v. Shay] and [United States v. Hall], because that's how they've defined it.  But without more I think you've gotten -- you've gotten into the second part of Rule 702, where the Tenth Circuit has

expressed complete concern over an expert coming in and just vouching, essentially
--

. . . .

[THE COURT:]  Tell me what a psychologist could come in and say that would fit
within the exception that Judge Kelly found in [United States v. Benally].

MS. ROZZONI:  I think that he could come in and say, if in fact he had done this,
I've evaluated Mr. Ganadonegro, I've run all of these particular tests, I've determined
that he is in fact a pathological liar --

THE COURT:  It seems to me that would trouble me even more than what he's doing
here, to have somebody come in and say he's a pathological liar seems to me closer
to vouching and commenting on the credibility than coming in and saying somebody,
because of their culture or their mental skills might be might be subject to
suggestion.  The pathological liar sort of frightens me to allow that.

Tr. at 69:13-16 (Court).  Ganadonegro conceded at the hearing that, if the expert testimony gets into

the credibility side, then the testimony is prejudicial.  See Tr. at 79:8-11 (Court, Pori).

## LAW REGARDING THE COURT'S ROLE UNDER *DAUBERT V.*
## *MERRELL DOW PHARMACEUTICALS, INC.*

Since the Supreme Court decided Daubert v. Merrell Dow Pharmaceuticals, Inc., trial courts

have had the responsibility to make certain that proffered experts will assist the jury in

understanding the evidence and in determining the factual issues it must decide.  The Court now

must not only decide whether the expert is qualified to testify, but, under Daubert v. Merrell Dow

Pharmaceuticals, Inc., whether the opinion testimony is the product of a reliable methodology.[4]

Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the proffered expert's

reasoning to determine if that reasoning is sound.

---

[4] The Supreme Court in Daubert v. Merrell Down Pharmaceuticals addressed in detail how
courts should determine whether opinion testimony is the product of a reliable methodology, but did
not discuss the issue of whether an expert is qualified to testify.

1.      **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994).  The Federal Rule of Evidence uses a liberal definition of "expert."  Fed. R. Evid. 702 advisory committee's note ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.").

An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."  LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004).  The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.  See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications."  Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal

-11-

quotation marks omitted).  The Court should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

### 2.     The Standard in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*

In its role of gatekeeper, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. CIV 03-1160 BB/LAM, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).  The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.  The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The United States Court of Appeals for

the Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." [Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)] (quoting Daubert, 509 U.S. at 589 . . . .). This obligation involves a two-part inquiry. Id. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.' " Id. (quoting Daubert, 509 U.S. at 592 . . . .). In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ." Id. (quoting Daubert, 509 U.S. at 592-93 . . . .). Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

397 F.3d at 883-84 (footnote omitted). "The second inquiry is related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . . The evidence must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court), and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591)). If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *11 (D.N.M.)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595). "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (internal quotation marks and bracket omitted). The proponent of the expert's opinion testimony

-13-

bears the burden of establishing that the expert is qualified, that the methodology he or she uses to

support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus

will be helpful to the jury.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.  As the Tenth

Circuit noted in Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing
> reliability under Daubert, and because, in light of that discretion, there is not an
> extensive body of appellate case law defining the criteria for assessing scientific
> reliability, we are limited to determining whether the district court's application of
> the Daubert manifests a clear error of judgment or exceeds the bounds of permissible
> choice in the circumstances. . . . Thus, when coupled with this deferential standard
> of review, Daubert's effort to safeguard the reliability of science in the courtroom
> may produce a counter-intuitive effect: different courts relying on the essentially the
> same science may reach different results.

289 F.3d at 1206.  As the United States Court of Appeals for the Ninth Circuit noted in Claar v.

Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the
> antithesis of this method.  Certainly, scientists may form initial tentative hypotheses.
> However, scientists whose conviction about the ultimate conclusion of their research
> is so firm that they are willing to aver under oath that it is correct prior to performing
> the necessary validating tests could properly be viewed by the district court as
> lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-503.

> Once reliability is established, however, it is still within the district court's discretion
> to determine whether expert testimony will be helpful to the trier of fact.  In making
> that determination, the court should consider, among other factors, the testimony's
> relevance, the jurors' common knowledge and experience, and whether the expert's
> testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *10 (citing United

States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

A defendant is entitled, under some circumstances, to request a written summary of expert

testimony the United States intends to use in its case-in-chief.  Rule 16 of the Federal Rules of

Criminal Procedure provides:

> **Expert witnesses.** -- At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.  If the government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition.  The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).  Rule 16 similarly provides that a defendant must produce a summary of expert testimony under some circumstances:

> **Expert witnesses.** -- The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if--
>
>> (i) the defendant requests disclosure under subdivision (a)(1)(G) and the government complies; or
>>
>> (ii) the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition.
>
> This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(b)(1)(C).

An untested hypothesis does not provide a scientific basis to support an expert opinion.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not

-15-

required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies, including dose and route administration); Tyler v. Sterling Drug., Inc., 19 F.Supp.2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. Magnetek, Inc., 360 F.3d at 1213 ("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

## ANALYSIS

The Court will grant in part and deny in part the United States' motion. "Faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert v. Merrell Down Pharms., Inc., 509 U.S. at 592. The Court finds that at least some of Dr. Roll's testimony is reliable. It finds that Dr. Roll's testimony, insofar as it goes to the credibility of Ganadonegro's statements in the interview, is irrelevant. The Court will thus exclude this testimony. See United States v. Adams, 271 F.3d at 1245-46 (finding that the district court did not abuse its discretion in excluding expert testimony that the defendant's low neurocognitive functioning and dependent personality structure strongly raised

the possibility that he was not telling the truth when he made incriminating statements to law enforcement officers).  The Court finds that Dr. Roll's testimony, insofar as it relates to the voluntariness of Ganadonegro's statements in the interview, is relevant.  See United States v. Benally, 541 F.3d at 995-96 (stating that it had previously recognized that United States v. Hall and United States v. Shay stood "only for the proposition that expert testimony regarding the voluntariness of a confession is admissible when the expert will testify to the existence of the defendant's identifiable medical disorder that raises a question regarding the defendant's cognitive voluntariness").  Because the danger of unfair prejudice to the United States does not substantially outweigh the probative value of Dr. Roll's testimony relating to voluntariness, the Court will not exclude this evidence.  See Fed. R. Evid. 403.

I.     **GANADONEGRO HAS PRESENTED SUFFICIENT INFORMATION ABOUT WHAT DR. ROLL WILL TESTIFY.**

The United States argues that Dr. Roll's three-page report is wholly inadequate to meet rule 702's requirements.  It argues that, other than a passing mention in the first paragraph of the report of certain tests he performed in his evaluation of Ganadonegro, Dr. Roll makes no effort to explain how the five tests relate to his ultimate conclusion regarding Ganadonegro's allegedly false admissions.

Ganadonegro asserts that Dr. Roll evaluated him over a period of three days, that Dr. Roll formed his opinion based on his interview with Ganadonegro, and on the results of a battery of psychological tests that included the Rorschach, MMPI-2, Thematic Appreciation Test, WAIS III, Wide Range Achievement Test, and Human Figure Drawings.  Ganadonegro argues that the United States does not dispute that each of the psychological testing instruments which Dr. Roll employed have been tested, subjected to peer review, contain rates of error for malingering, have standards

-17-

which control their operation, and have been generally accepted in the scientific community. Ganadonegro also asserts that the United States never disputes that Dr. Roll is qualified to administer and interpret the results of the tests. Ganadonegro thus contends that nothing in the United States' motion suggests that the standards Dr. Roll employed in reaching his conclusions are unreliable.

In its role of gatekeeper, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95. The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95. The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; and whether it unduly relies on anecdotal evidence. See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649, at *3 (citation omitted). In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595). "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is

simply too great an analytical gap between the data and the opinion proffered." <u>Armeanu v.</u> <u>Bridgestone/Firestone N. Am., Tire, LLC</u>, 2006 WL 4060665, at *11 (internal quotation marks and bracket omitted). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. <u>See</u> <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 881.

Dr. Roll is a forensic psychologist and a professor emeritus at the University of New Mexico. <u>See</u> Curriculum Vitae for Dr. Samuel Roll at 1, Defendant's Exhibit A ("Dr. Roll's Curriculum Vitae"). Dr. Roll has a bachelor of arts in psychology, a master of science in psychology, and a doctorate in psychology. <u>See</u> Dr. Roll's Curriculum Vitae at 1. Dr. Roll has published numerous articles. <u>See</u> Dr. Roll's Curriculum Vitae at 3-12. At the hearing, Dr. Roll testified that he met Ganadonegro in July, 2009 to "do a psychological evaluation." Tr. at 17:8-12 (Pori, Roll). He testified that, "in doing th[e] psychological evaluation, [he] gave [Ganadonegro] . . . a standard battery of psychological tests that consisted of . . . the Wechsler, which is an intelligence test that breaks intelligence down into about a dozen components . . .[,] the Wide Range Achievement Test which tests the ability to read . . . [,] the MMPI and the Rorschach test." Tr. at 17:11-18 (Pori, Roll). Dr. Roll testified that all of the "tests a[re] generally accepted among forensic psychologists." Tr. at 17:19-21 (Pori, Roll). Dr. Roll also testified that all the tests are "subjected to peer review and analysis in learned journals," stating that the tests "have been published in peer re[viewed] j[ournal]s[,] have had between hundreds and thousands of peer-reviewed articles and are accepted in the field of psychology." Tr. at 17:22-18:2. Dr. Roll testified that the "tests have norms which would demonstrate whether or not a person . . . is fa[k]ing or malingering or otherwise producing an[ ] invalid response to the questions in the tests." Tr. at 18:3-9 (Pori, Roll). Dr. Roll testified that

-19-

there are "measures on the Rorschach that indicate that the test is reliable and taken in a valid[ ] [manner] and the inconsistency measures on the Wechsler that also indicate that the test was taken in a straightforward manner." Tr. at 18:19-19:3 (Roll). Dr. Roll testified that, based on the tests, Ganadonegro has low verbal skills; the tests showed that his overall intelligence is in the normal range -- he is in the forty-second percentile -- but that his verbal I.Q. is at the eighteenth percentile and his verbal comprehension is in the twelfth percentile. See Tr. at 19:8-12 (Roll). Dr. Roll further stated that, in the reading portion of the Wide Range Achievement Test, Ganadonegro was at the twelfth percentile. See Tr. at 20:1-3 (Roll). Dr. Roll testified that Ganadonegro's verbal skills are in the retarded area, but not his perceptual skills or his motor skills. See Tr. at 27:13-28:4 (Torrez, Roll). Dr. Roll testified that the tests measured whether Ganadonegro had a positive self-image or low self-esteem, and stated that the scores indicated that he has a low sense of self-esteem and self-confidence. See Tr. at 20:17-24 (Pori, Roll). In the digit span area, Ganadonegro scored a ninety, which is low normal, and that, in verbal knowledge, he scored a sixty -- which is in the retarded area. See Tr. at 30:4-16 (Torrez, Roll).

The Court finds that Dr. Roll's testimony is reliable. Dr. Roll has testified that the tests he used have been subjected to peer review and publication, and that the tests are generally accepted among forensic psychologists. See Daubert v. Merrell Dow Phams., Inc., 509 U.S. at 594-95 (listing non-exclusive factors that weigh into a reliability determination, including whether the method has been published and subject to peer review, and whether the witness' method is generally accepted as reliable in the relevant medical and scientific community); United States v. Lopez-Hodgson, 333 F. App'x 347, 354 (10th Cir. 2009)(finding that the district judge did not abuse its discretion in finding that Dr. Frederick's testimony was reliable, and stating that "Dr. Frederick testified that the manner in which he evaluated Mr. Lopez-Hodgson -- the tests he chose to administer and

observation -- was the standard way to evaluate a patient in a psychiatric hospital" (citations omitted)). Dr. Roll also testified that the tests he used had norms which demonstrated whether a person was malingering or producing invalid responses. Cf. Daubert v. Merrell Dow Phams., Inc., 509 U.S. at 594-95 (listing non-exclusive factors that weigh into a reliability determination, including the method's error rate). Dr. Roll also testified regarding how he came to his conclusions based on the tests he gave; for example, he found that Ganadonegro has low verbal skills, because his verbal comprehension is at the twelfth percentile. See Sallahdin v. Gibson, 275 F.3d 1211, 1238 (10th Cir. 2002)(concluding that the testimony was admissible, and stating that it was " persuaded that Dr. Pope's conclusions regarding the effects of anabolic steroids were based upon scientific knowledge . . . and thus were sufficiently reliable"). Dr. Roll is a qualified and respected psychologist in Albuquerque, New Mexico, and has published extensively. Dr. Roll employed standard tests that psychologists routinely use; the tests appear to be used by Dr. Roll's peers, accepted by other psychologists in the field, and accepted in the psychological journals. There is no suggestion that he administered them incorrectly. There is also no evidence that the test results are not reliable. Thus, Dr. Roll's testimony appears sound and has solid foundation in accepted psychology methodology. The Court thus finds that Dr. Roll's testimony about the tests and the results of the tests is reliable. See United States v. Rodriguez-Felix, 450 F.3d 1117, 1125-26 (10th Cir. 2006)(finding that the district court did not abuse its discretion in excluding Dr. Clark's testimony, because the report was insufficient to allow the district court to ""assess the reasoning and methodology underlying the expert's opinion," and stating that the description of Dr. Clark's research was inadequate, because "it fails to indicate whether it has been subjected to peer review, whether it has been published, and whether it has been accepted by other psychologists in the field," and because, "other than generalized assertions regarding the factors which can affect an

eyewitness's identification," Dr. Clark's report "fails to sufficiently reference specific and recognized scientific research, which underlies Dr. Clark's conclusions, such that the court could determine if this foundational research had been subjected to peer review, and, if so, whether it had been accepted in the community").

## II.     DR. ROLL'S TESTIMONY, INSOFAR AS IT GOES TO THE CREDIBILITY OF GANADONEGRO'S STATEMENTS, IS IRRELEVANT.

The United States also argues that, as a matter of law, Dr. Roll's proposed testimony is irrelevant, and infringes on the jury's province to determine the facts and to assess credibility.  The United States argues that Ganadonegro seeks to have Dr. Roll testify as to his verbal abilities, level of intelligence, and personality structure that make him particularly susceptible to false confessions and vulnerable to suggestion.  It argues that Dr. Roll contends that Ganadonegro's language, cultural, and personality factors increase the probability of him making false admissions, and that this is the same testimony that United States v. Adams and United States v. Benally prohibit.  It argues that Dr. Roll fails to diagnose Ganadonegro with any identifiable medical disorder which raises any question regarding the cognitive voluntariness of his statements to law enforcement officers, and that, instead, he describes alleged personality features and concludes that such features simply increase the probability of a false confession.  The United States argues that, as such, Dr. Roll's testimony would fall squarely within the holdings of United States v. Adams and United States v. Benally.  It argues that this testimony encroaches on the jury's vital and exclusive function to make credibility determinations, and thus will not assist the trier of fact as rule 702 requires.  The United States thus asks the Court to exclude Dr. Roll's testimony.

Ganadonegro contends that Dr. Roll's testimony is relevant and admissible, because the phenomenon of false confession is not well known to the general public and few people understand

the circumstances which could lead someone to falsely testify to a crime he or she did not commit.

Ganadonegro argues that Dr. Roll's proffered testimony is admissible, because evidence concerning

the physical and psychological environment that yielded the confession can be of substantial

relevance to the ultimate factual issue of a defendant's guilt or innocence.  He argues that, as long

as the expert witness evaluates the defendant and describes the psychological circumstances which

could give rise to his suggestibility, without opining that the defendant was not telling the truth when

he made incriminating statements, the proffered testimony is admissible.

Rule 702 requires the trial court to "determine whether the expert is proposing to testify to

(1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to

understand or determine a fact in issue."  United States v. Muldrow, 19 F.3d at 1337.  In its role of

gatekeeper, a court must assess the reasoning and methodology underlying an expert's opinion, and

determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it

is helpful to the trier of fact.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95.  "The

second inquiry is related to the first. Under the relevance prong of the Daubert analysis, the court

must ensure that the proposed expert testimony logically advances a material aspect of the

case . . . .  The evidence must have a valid scientific connection to the disputed facts in the case."

Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citation omitted).

Several circuit courts have addressed the exclusion of expert testimony regarding the

reliability of the defendant's admissions or the defendant's susceptibility to false admissions,

see United States v. Shay, 57 F.3d 126; United States v. Hall, 92 F.3d 1337, and the Tenth Circuit

discusses these cases in its opinions addressing the issue, see United States v. Adams, 271 F.3d at

1245 ("Only two circuit courts have dealt with the question of the admissibility of expert testimony

concerning credibility, and both, under the facts of those cases and the manner of presentation,

concluded that the respective trial court committed error in excluding such testimony." (citing United States v. Shay and United States v. Hall)).  In United States v. Shay, the United States Court of Appeals for the First Circuit addressed whether the district court "properly prevented the defendant from supporting his argument [that the incriminating statements he made were unreliable and should be disregarded] by calling a psychiatrist to testify that he suffered from a mental disorder that causes its victims to make false and grandiose statements without regard to the consequences." 57 F.3d at 128.  The defendant offered an expert who was prepared to testify that he suffered from a mental disorder that "caused him to make grandiose statements similar in nature to the statements that the government was seeking to use against him."  57 F.3d at 133.

> The district court excluded the testimony because it concluded that the testimony would not assist the jury in light of other evidence in the record concerning the reliability of Shay Jr.'s statements. However, whether or not the jury had the capacity to generally assess the reliability of these statements in light of the other evidence in the case, it plainly was unqualified to determine without assistance the particular issue of whether Shay Jr. may have made false statements against his own interests because he suffered from a mental disorder. Common understanding conforms to the notion that a person ordinarily does not make untruthful inculpatory statements. See Fed.R.Evid. 804(b)(3) advisory committee's note (statements against interest are especially reliable because "persons do not make statements which are damaging to themselves unless satisfied for good reasons that they are true"). Dr. Phillips would have testified that, contrary to this common sense assumption, Shay Jr. suffered from a recognized mental disorder that caused him to make false statements even though they were inconsistent with his apparent self-interest. Thus, Dr. Phillips was prepared to offer specialized opinion testimony, grounded in his expertise as a psychiatrist, that could have "explode[d] common myths" about evidence vital to the government's case. United States v. Moore, 786 F.2d 1308, 1312 (5th Cir. 1986) (citations omitted). While the record contains other evidence that Shay Jr. told lies and boasted to an unusual degree, this evidence, standing alone, is much less powerful than the psychiatric testimony that Dr. Phillips was prepared to offer. Moreover, the court did not express any concern that Dr. Phillips was unqualified or that his testimony was unreliable because it concerned some novel or ad hoc syndrome. Under all of the circumstances, it was a clear  error in judgment for the district court to exclude the testimony under any plausible interpretation of Rule 702.

57 F.3d at 133-34.

      In <u>United States v. Hall</u>, the United States Court of Appeals for the Seventh Circuit found that the district court erred in excluding testimony the defendant proffered, which "would have put before the jury his claim that his 'confession' to the crime was actually false."  93 F.3d at 1339.

      Fifteen-year-old Jessica Roach was last seen in the afternoon of Monday, September 20, 1993, riding her new bicycle near her home in rural Georgetown, Vermilion County, Illinois. About one-half hour later, her sister saw Jessica's bicycle lying in the roadway. Concerned, she returned home, and her father called the police. About six weeks later, on November 8, 1993, Jessica's decomposed body was found across the state line, near Perrysville, Indiana, mutilated by a farmer's combine. Due to the extensive damage caused by both the machine and the passage of time, it was impossible for investigators to be sure of the cause of death. The police were hampered in their efforts to solve the crime because of the total absence of physical evidence either at the scene of her disappearance or where her body was found.

      Months later, on October 22, 1994, two girls in Georgetown reported that they had been followed by a man in a van. He asked them questions as he drove by, but he did not attempt to get out of the vehicle. Nevertheless, they found him suspicious, and they retreated to a house where they could call for help. They also obtained his license plate number. The man turned out to be Larry Hall. Following up on the girls' report, Vermilion County Sheriff's Investigator Gary Miller went to Hall's home in Wabash, Indiana, on November 2, 1994, to question him about the incident. Hall confirmed that he had stopped and spoken to the girls, but he denied doing anything more.  The police realized that Hall was the man who had also followed two other teenaged girls on May 29, 1994, in Georgetown. Those two were able to elude Hall by riding their bicycles through an alley that was blocked to motor traffic by a truck. It became apparent that Hall had a habit of stalking, or following, teenaged girls.

. . . .

      Sgt. Amones . . . asked Hall to come to the Wabash Police Department on November 2, 1994. He told Hall that someone from Illinois wanted to speak with him, and that person turned out to be Officer Miller. Miller began by questioning Hall about the October incident in Georgetown, but he soon turned to the Jessica Roach case. (It is worth noting that Miller had, by this time, taken a statement from another individual who had confessed to abducting Roach and dumping her body in the cornfield. Transcript at 455–56. This fact was not developed at the trial.) Hall initially denied ever seeing Jessica. Some of the evidence indicated that Miller became upset with Hall's responses, moved closer to Hall, and started suggesting the "right" answers as the questioning progressed. The government does not directly dispute this, although it claims that no one physically abused Hall. Hall began crying at some point, and he asked Amones during a break what was expected of him. After

two and a half hours or so, the police allowed Hall to leave.

> On November 15, the police told Hall that they needed to question him again. This session lasted from around 10:00 a.m. that morning until about 3:20 a.m. the next morning. By now, the FBI was involved in the investigation. Hall refused to take a polygraph test that FBI Agent Randolph was prepared to administer. Randolph interrogated him alone for about two hours. About that time, Hall began to talk about Jessica Roach; another 20 or 30 minutes later, he began making admissions about his involvement in the Roach case. There were no notes, tape recordings, or video recordings of the session. Instead, Randolph wrote out a statement in narrative format and asked Hall to sign it. Miller was present for at least part of this questioning, and continued to talk with Hall for an hour or so after the statement was signed. It is a little difficult to make the hours here add up, but the record shows that Hall was booked into the Grant County Jail at 3:25 a.m. on November 16, 1994.

93 F.3d at 1339-40.  On appeal, Hall argued that the district court erred in refusing to permit his

experts to testify about false confessions and his susceptibility to coercion.  See 93 F.3d at 1340.

> Hall tendered Dr. Richard Ofshe as a social psychologist expert in the field of coercive police interrogation techniques and the phenomenon of false or coerced confessions. Ofshe had been on the faculty of the University of California at Berkeley since 1962, had a Ph.D. in psychology from Stanford University, and had published widely. He had also worked extensively both with law enforcement officials and with defense counsel. He indicated that he would have testified about the fact that experts in his field agree that false confessions exist, that individuals can be coerced into giving false confessions, and that certain indicia can be identified to show when they are likely to occur. He described his methodology in general terms, and what factors experts in the field rely upon to distinguish between reliable and unreliable confessions. The district court rejected the proffer of Dr. Ofshe's testimony in its entirety, on two grounds: (1) Dr. Ofshe would need to judge the credibility of Randolph's and Miller's testimony about what happened during the interrogation of Hall, and (2) in the final analysis, Dr. Ofshe's testimony would add nothing to what the jury would know from common experience.

> Hall also proffered testimony from Dr. Traugott, a psychiatrist who had examined him. Like Dr. Ofshe, Dr. Traugott's credentials as a psychiatrist were not in question. The district court allowed Dr. Traugott to testify about Hall's mental condition ( e.g., his attention-seeking behavior and his high level of suggestibility) and to opine that one of the problems for someone interrogating Hall (including himself, as a professional) was that Hall could easily be led to give the type of response he believed the questioner was seeking. Hall's appeal focuses on other testimony that he wanted Dr. Traugott to offer, which the district court refused to allow. The proffer shows that Dr. Traugott would have testified about Hall's susceptibility to various interrogation techniques, the propriety of suggesting

-26-

answers to Hall, and Hall's capability of confessing to a crime that he did not commit. The court found that the jury could appreciate whether police interrogation techniques were suggestive by themselves and that Dr. Traugott's testimony would invade the prerogative of the jury to assess Randolph's and Miller's credibility.

93 F.3d at 1341.  The district court found no potential usefulness in the evidence, "because it was

within the jury's knowledge."  93 F.3d at 1345.

> Even though the jury may have had beliefs about the subject, the question is whether those beliefs were correct. Properly conducted social science research often shows that commonly held beliefs are in error. Dr. Ofshe's testimony, assuming its scientific validity, would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried.

> The district court's conclusion therefore missed the point of the proffer. It was precisely because juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions that the testimony would have assisted the jury in making its decision. It would have been up to the jury, of course, to decide how much weight to attach to Dr. Ofshe's theory, and to decide whether they believed his explanation of Hall's behavior or the more commonplace explanation that the confession was true. But the jury here may have been deprived of critical information it should have had in evaluating Hall's case.

> We have the same concerns about the court's decision with respect to Dr. Traugott, although this is a closer case, because the judge permitted him to testify about Hall's mental condition. He was also allowed to testify that someone interrogating Hall would experience difficulty obtaining reliable answers, because Hall was easily led. On remand, it is clear that at least this much would be admissible again from Dr. Traugott. But more was needed to link the condition Dr. Ofshe identified to Hall himself, and Dr. Traugott was prepared to do this. Based on his personal examination of Hall and Hall's medical records, he would have testified about Hall's susceptibility to various interrogation techniques and his propensity to give a false confession. Even if the testimony about propensity touched on a key issue in the case, experts are entitled under Rule 704(a) to offer an opinion on the ultimate issue in a case. The fact that there was a dispute between Hall and the interrogating officers about the nature of the questioning itself provides no reason to exclude the expert testimony; it is a rare case where everything is agreed except the subject matter for which the expert is presented. It is enough if the expert makes clear what his opinion is, based on the different possible factual scenarios that might have taken place.

93 F.3d at 1345-46.

-27-

In United States v. Adams, the defendant argued that the district court's "exclusion of expert testimony by a clinical psychologist denied his right to due process and a fair trial." 271 F.3d at 1240. The police had responded to a residential disturbance, and, upon arriving at the scene, an officer looked into a vehicle the defendant and another individual occupied, and saw a black case, which he determined contained an assault-style semi-automatic pistol. See id. at 1240. Upon questioning, the defendant told the officer that the vehicle and weapon belonged to him, and that he had purchased the weapon a few days earlier. See 271 F.3d at 1240. Defense counsel arranged a psychological examination for the defendant, and the defense anticipated introducing the resulting psychological report. See 271 F.3d at 1240. The United States moved to exclude the report, arguing that the substance was inadmissible and that the defense notified it about the report past the deadline set out in the discovery order. See 271 F.3d at 1240. The district court granted the Untied States' motion. See 271 F.3d at 1240. The defendant "tried again at the onset of trial to admit the psychologist's report, claiming that it was relevant to Mr. Adams's mental condition and education, factors that could be considered in judging the credibility of his incriminating statements." 271 F.3d at 1240. "Again, the [United States] objected to the substance and timing of the evidence and again the court excluded it." 271 F.3d at 1240. At trial, the United States relied heavily on the incriminating statements the defendant made to the officers. See 271 F.3d at 1240. The jury returned a guilty verdict. See 271 F.3d at 1241. The Tenth Circuit reviewed the exclusion of the report for an abuse of discretion. See 271 F.3d at 1243. The defendant "sought to introduce the psychological evidence in order to diminish the credibility of his earlier statements to the police." 271 F.3d at 1244. On appeal, he argued that the testimony showed that he had neurocognitive impairment and a dependent personality structure, and that this evidence supported the possibility that the statements he gave to the police were false. See 271 F.3d at 1244. The Tenth Circuit stated:

-28-

[The defendant] cites <u>Crane v. Kentucky</u>, 476 U.S. 683 . . . (1986), as precedent for allowing expert testimony bearing on the credibility of prior testimony or a confession.  Aplt. Br. at 15 16. Crane did distinguish pretrial inquiries into the voluntariness of a confession from a defendant's challenge to the reliability of the confession during the course of the trial.  <u>Crane</u>, 476 U.S. at 687 . . . .  Even after a confession is deemed voluntary, evidence concerning the "physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of a defendant's guilt or innocence."  <u>Id.</u> at 689 . . . .  The "blanket exclusion" of evidence regarding the circumstances of a confession precludes a fair trial.  <u>Id.</u> at 690 . . . . <u>Crane</u> did not address, however, whether the "physical and psychological environment that yielded the confession," <u>id.</u> at 689 . . . , includes the psychological makeup of the confessor, or when expert testimony should be admitted to address that element. Only two circuit courts have dealt with the question of the admissibility of expert testimony concerning credibility, and both, under the facts of those cases and the manner of presentation, concluded that the respective trial court committed error in excluding such testimony. <u>United States v. Shay</u>, 57 F.3d 126, 132 (1st Cir.1995); <u>United States v..</u> [sic] <u>Hall</u>, 93 F.3d 1337, 1346 (7th Cir.1996).

271 F.3d at 1244-45.  The Tenth Circuit noted that the "Supreme Court has held that Rule 702 imposes a special obligation upon a trial judge to ensure that all expert testimony, even non-scientific and experience-based expert testimony, is both relevant and reliable."  271 F.3d at 1245 (citations omitted).  The Tenth Circuit stated:

We have said that "[t]he credibility of witnesses is generally not an appropriate subject for expert testimony." [<u>United States v. </u>]<u>Toledo</u>, 985 F.2d [1462,] 1470 [(10th Cir. 1993)]. Though <u>Crane</u> prohibits categorical exclusion of this type of evidence, it does not require its categorical admission -- the rules of evidence still apply. There are a variety of reasons that evidence related to the credibility of a confession may be excluded. First, "expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702." <u>United States v. Charley</u>, 189 F.3d 1251, 1267 (10th Cir.1999) (quoting Rule 702). <u>See</u> <u>also</u> <u>United States v.. </u>[sic] <u>Call</u>, 129 F.3d 1402, 1406 (10th Cir.1997)(testimony concerning credibility is often excluded because it usurps a critical function of the jury, which is capable of making its own determinations regarding credibility); <u>United States v. Samara</u>, 643 F.2d 701, 705 (10th Cir.), <u>cert. denied</u>, 454 U.S. 829 . . . (1981). Also, a proposed expert's opinion that a witness is lying or telling the truth might be "inadmissible pursuant to Rule 702 because the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion." <u>Shay</u>, 57 F.3d at 131. Yet another rationale for exclusion is that the testimony of

impressively qualified experts on the credibility of other witnesses is prejudicial, unduly influences the jury, and should be excluded under Rule 403. Toledo, 985 F.2d at 1470; cf. Call, 129 F.3d at 1406 (polygraph results may be excluded under Rule 403 because jury may overvalue scientific results as indication of truthfulness).

In this case, [the defendant] defended on the basis that the repeated, incriminatory statements he gave to law enforcement were untrue, made only to protect his girlfriend, who he believed at the time to be pregnant. R.O.A. Vol. II, at 208–09. The expert concluded that [the defendant's] low neurocognitive functioning and dependent personality structure "strongly raise [ ] the possibility, given the conflicting explanations made by [the defendant] and others, that he was not telling the truth when he made incriminating statements to Wichita Police Officers and ATF agents. His statements that he was 'protecting a girlfriend' when he confessed to possession of the firearm is consistent with his personality and cognitive state, and indicative of his difficulty making appropriate and reasoned choices." Report at 5 (emphasis added).

The district court was careful to recognize that, in some circumstances, credibility testimony by an expert might be allowed, however, it did not abuse its discretion in excluding it here. R.O.A. Supp. Vol. I, at 8. The psychologist, in light of the conflicting explanations and his evaluation of [the defendant], concluded that [the defendant's] account (that he lied to protect his pregnant girlfriend) was plausible, albeit misguided. We have reviewed the report, and find the district court was within its discretion in holding that the report was little more than a professionally-trained witness testifying that, based upon his history, "[the defendant] is the type of person who would have lied about his involvement to the police." Id. at 7. This case is readily distinguishable from Hall, 93 F.3d at 1341, where the defendant claimed that a personality disorder caused him to confess during interrogation and sign a statement in order to gain approval of his interrogators, and Shay, 57 F.3d at 129-30, where the defendant claimed that his confession was the product of a mental disorder characterized by an extreme form of pathological lying. In this case, there simply is no question about the voluntariness of the confessions -- and defendant's recantation that he lied in order to protect his girlfriend is precisely the type of explanation that a jury is capable of resolving without expert testimony. The offered testimony does little more than "vouch for the credibility of another witness" and thereby "encroaches upon the jury's vital and exclusive function to make credibility determinations." Charley, 189 F.3d at 1267. The judge was well within his discretion in determining that the evidence lacked relevance and would not "assist the trier of fact as required by Rule 702." Id.

271 F.3d at 1245-46 (emphasis in original).

In United States v. Benally, the defendant argued that the district court abused its discretion

by excluding testimony of an "expert witness on false confessions who would have provided support

-30-

for his claim that his confession to FBI agents was untrue." 541 F.3d at 992. Two girls indicated

that they had been sexually abused by the defendant. See 541 F.3d at 992. Following these

allegations, FBI officers interviewed the defendant. See 541 F.3d at 992. The defendant "initially

denied touching either girl inappropriately, but confessed to the allegations later in the interview.

At the conclusion of the meeting, he provided the agents with a written confession." 541 F.3d at

992. At trial, the defendant disavowed his confession "and claimed it was prompted by coercive

tactics used by the FBI agents. He testified that the agents repeatedly insisted he was lying when he

denied the charges and 'would not take no for an answer.'" 541 F.3d at 993.

> He also reported that one of the agents engaged in aggressive, leading questioning,
> and that at one point, the agent threatened to remove him from his workplace in
> handcuffs unless he cooperated. He indicated that the agents made him feel as if he
> could not leave the room unless he cooperated and confessed. One of the agents
> testified that they never threatened [the defendant], and did not make any promises
> to him. The agent claimed the only guidance he provided [the defendant] in drafting
> the confession consisted of basic directions such as "put in there what happened" and
> "if you want, you can tell them you want to apologize."

541 F.3d at 993. Before trial, the defendant notified the United States that he planned to call "Dr.

Deborah Davis, a professor of psychology at the University of Nevada at Reno, as an expert witness

on false confessions." 541 F.3d at 993. The defendant "offered Dr. Davis's testimony on two

subjects: (1) whether false confessions occur; and (2) why people confess falsely. Dr. Davis had

never examined [the defendant], and would not offer an opinion as to whether he confessed falsely."

541 F.3d at 993. At a hearing pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., the district

court ruled that Dr. Davis' testimony was inadmissible, because "it did not meet the standards for

relevant or reliability required by Daubert." 541 F.3d at 993. On appeal, the defendant argued that

the district court erred by excluding Dr. Davis' testimony on false confessions. See 541 F.3d at 993.

> He stresse[d] that Dr. Davis would only have testified to the frequency of false
> confessions and the interrogation techniques known to cause them, and would not

have offered an opinion as to whether [he] confessed falsely. He contends that the limited purpose of this testimony was to overcome the perception that sane people either do not confess falsely, or do so only rarely. He suggests that by presenting general testimony from Dr. Davis regarding the phenomenon of false confessions in tandem with his specific testimony regarding the conditions of his interrogation, his explanation for why he confessed falsely would be placed into a broader, more believable context.

541 F.3d at 993-94. The Tenth Circuit found that the district court did not abuse its discretion by excluding Dr. Davis' testimony. See 541 F.3d at 994. It stated that United States v. Adams supported its conclusion. See 541 F.3d at 994. The defendant sought to distinguish his case from United States v. Adams "based on the fact that unlike the expert in Adams, Dr. Davis did not intend to provide an opinion as to whether the defendant before the court falsely confessed." 541 F.3d at 995. The Tenth Circuit stated:

By stressing this fact, [the defendant] is responding to the concern expressed in Adams that "a proposed expert's opinion that a witness is lying or telling the truth might be inadmissible . . . because the opinion exceeds the scope of the expert's specialized knowledge." [The defendant's] argument does not, however, address the other problems associated with this type of testimony that were identified in Adams.

First, Dr. Davis's testimony inevitably would "encroach[ ] upon the jury's vital and exclusive function to make credibility determinations." See id. While [the defendant] emphasizes that Dr. Davis would not have opined as to whether she believed [the defendant] confessed falsely, with or without the opinion, the import of her expert testimony would be the same: disregard the confession and credit the defendant's testimony that his confession was a lie. Testimony concerning credibility "is often excluded because it usurps a critical function of the jury and because it is not helpful to the jury, which is capable of making its own determination regarding credibility." United States v. Call, 129 F.3d 1402, 1406 (10th Cir.1997).

In addition, the district court did not abuse its discretion by concluding that the prejudicial effect of Dr. Davis's testimony would substantially outweigh its probative value. See Fed.R.Evid. 403; see also Call, 129 F.3d at 1404-05 (10th Cir.1997) (noting that "even if polygraph evidence should satisfy Rule 702, it still must survive the rigors of Rule 403"). First, with respect to the testimony's probative value, whatever relevance it had under Fed.R.Evid. 401 was minimal. Dr. Davis did not examine [the defendant], and was not going to specifically discuss him or the circumstances surrounding his confession in her testimony. She would only have testified generally about the conditions known to cause false confessions, which

-32-

would have included a discussion about the effects of conditions not at issue here, such as torture, in order to establish "the counterintuitive notion that false confessions do in fact occur." Aplt. Br. at 15. Even if we were to assume the limited relevance of this general testimony, we conclude that a district court could reasonably conclude that the prejudice to the prosecution that would result from permitting an expert to opine that prior confessions should essentially be disregarded because they are just as likely to be true as untrue, substantially outweighs the testimony's minimal probative value.

[The defendant] urges this court to follow the rationale of several decisions from other circuits reversing district court decisions to exclude expert testimony regarding a defendant's susceptibility to making a false confession. Our opinion in Adams recognized two of these opinions, United States v. Hall, 93 F.3d 1337 (7th Cir.1996) and United States v. Shay, 57 F.3d 126 (1st Cir.1995), and found that they stand only for the proposition that expert testimony regarding the voluntariness of a confession is admissible when the expert will testify to the existence of the defendant's identifiable medical disorder that raises a question regarding the defendant's cognitive voluntariness. As in Adams,

> [t]his case is readily distinguishable from Hall, 93 F.3d at 1341, where the defendant claimed that a personality disorder caused him to confess during interrogation and sign a statement in order to gain approval of his interrogators, and Shay, 57 F.3d at 129-30, where the defendant claimed that his confession was the product of a mental disorder characterized by an extreme form of pathological lying.

Adams, 271 F.3d at 1246. [The defendant's] confession differs from the confessions in Hall and Shay because he does not identify a medical condition that contributed to his decision to confess. As for the third case cited by [the defendant], United States v. Belyea, 159 Fed.Appx. 525 (4th Cir.2005) (unpublished), it too is inapposite because it was decided principally on the basis of the district court's inadequate review of the expert's proffer. That is not the issue presented here.

The district court's decision to exclude Dr. Davis's testimony was not "arbitrary, capricious, whimsical or manifestly unreasonable." Champagne Metals, 458 F.3d at 1079. The concerns the district court expressed were legitimate and within the bounds of permissible choice, as reflected by prior rulings of this court.

541 F.3d at 995-96.

On a clean slate, the Court might be inclined to draw the same line that the Seventh Circuit

drew in United States v. Hall and that the First Circuit drew in United States v. Shay.  In other

words, the Court agrees that the defendant should be able to proffer a psychological expert to

explain to the jury that some defendants give, for whatever reason, false confessions to a crime, and that the defendant has psychological traits that make it possible that he would give a false confession.  The Court would not, as apparently any court would not, allow the expert to say a particular defendant gave a false confession.  The Court believes that this line prevents the expert from invading the province of the jury, provides relevant and useful information to a lay jury, and does not allow the expert to offer testimony on the credibility of the defendant.  It simply gives the jury the tools to make an informed decision about false confessions, which appear to actually occur. The public may not be aware of false confessions as much as those individuals in the criminal justice system, and the expert could provide valuable insight necessary to assure the defendant's Sixth Amendment right to present a defense.  The Court believes, particularly with careful limiting instructions, that a jury could distinguish between information about the psychology profession's beliefs about false confessions, and the limits on the expert's opinion as to what a particular defendant did.  Jurors are pretty smart, and the Court's experience is that they routinely ignore experts and make their own credibility decisions.  The Court is not, however, writing on a clean slate.  The Tenth Circuit has, in two published opinions, excluded testimony that the First Circuit and Seventh Circuit probably would have allowed.  The Court might manufacture some distinction between the circumstances in this case, and those in United States v. Adams and United States v. Benally, such as that the defendant in the Tenth Circuit cases did not challenge the voluntariness of the statement or the defendant did not have an identifiable medical disorder.  In the end, however, the Court does not believe any distinction to the Tenth Circuit's decisions would be sound and in good faith.  And in the end, our system depends upon district courts faithfully adhering to the circuit's law.  See United States v. Escobedo-Guillermo, 2009 WL 1231987, at *1 (D.N.M. April 27, 2009("[T]he Court, as a district court, must be careful to follow binding Tenth Circuit authority

. . . .").

The Court will thus exclude Dr. Roll's testimony insofar as it relates to the credibility of Ganadonegro's statements in the interview. Although the Tenth Circuit has instructed that a district court cannot "categorically exclude all expert testimony" regarding the credibility of incriminating statements, the Tenth Circuit has noted that "the credibility of witnesses is generally not an appropriate subject for expert testimony." United States v. Adams, 271 F.3d at 1244-45. As in United States v. Adams, where the Tenth Circuit found that the district court did not abuse its discretion in excluding the expert's testimony that the defendant's low neurocognitive functioning and dependent personality structure strongly raised the possibility that he was not telling the truth when he made incriminating statements to the police officers, because the testimony did little more than vouch for the credibility of another witness and thus encroached on the jury's exclusive function to make credibility determinations, the Tenth Circuit's opinion strongly suggests that Dr. Roll's testimony that there are a host of language factors, cultural factors, and personality factors that would have increased the probability of Ganadonegro making false admissions does little more than vouch for the credibility of Ganadonegro's statement, and thus encroaches on the jury's exclusive function to make credibility determinations. The Court thus finds, under United States v. Adams and United States v. Benally that the "evidence lack[s] relevance and would not assist the trier of fact as required by Rule 702." United States v. Adams, 271 F.2d at 1246 (internal quotation marks and citations omitted). See United States v. Benally, 541 F.3d at 995-96 (stating that Dr. Davis' testimony would encroach on the jury's vital and exclusive function to make credibility determinations, because, while the defendant argued that "Dr. Davis would not have opined as to whether she believed Mr. Benally confessed falsely, with or without the opinion, the import of her expert testimony would be the same: disregard the confession and credit the defendant's testimony

that his confession was a lie").  The Court will thus exclude this evidence.

## III.   THE COURT WILL NOT EXCLUDE SOME OF DR. ROLL'S TESTIMONY TO THE EXTENT IT IS OFFERED ON THE ISSUE OF VOLUNTARINESS.

The Court will not exclude some of Dr. Roll's testimony insofar as it relates to the voluntariness of Ganadonegro's statements in the interview.  Ganadonegro argues that, at trial, the United States will offer Ganadonegro's statements and that, in assessing the voluntariness of the confession, the triers of fact will consider the totality of the circumstances.  See Tr. at 9:2-9 (Pori). Unlike United States v. Adams, where there was "no question about the voluntariness of the confessions," 271 F.3d at 1246, there is a question whether Ganadonegro's statements were voluntary.  As in United States v. Hall, where the defendant contended that a personality disorder caused him to confess during interrogation and sign a statement to gain the approval of his interrogators, Ganadonegro contends that his low verbal skills and other personality factors made him vulnerable to suggestion in an interview and thus susceptible to falsely confessing.  "[I]t [i]s certainly within the jury's province to assess the truthfulness and accuracy of the confession." United States v. Hall, 93 F.3d at 1344.  The Tenth Circuit Pattern Jury Instructions state:

> In determining whether any such statement is reliable and credible, consider factors bearing on the voluntariness of the statement.  For example, consider the age, gender, training, education, occupation, and physical and mental condition of the defendant, and any evidence concerning his treatment while under interrogation if the statement was made in response to questioning by government officials, and all the other circumstances in evidence surrounding the making of the statement.
>
> After considering all this evidence, you may give such weight to the statement as you feel it deserves under all the circumstances.  If you determine that the statement is unreliable or not credible, you may disregard the statement entirely.

Tenth Circuit Pattern Jury Instructions Criminal § 1.25, at 40 (2011 Edition).[5]  Although this pattern

---

[5] The comment to Instruction 1.25 states that, in the Tenth Circuit, when a confession has been challenged as involuntary, the United States must prove by a preponderance of the evidence

jury instruction directs jurors to consider factors bearing on the voluntariness of the statement to determine whether the statement is reliable and credible, the precedent in the Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness.  See United States v. Benally, 541 F.3d at 996 (distinguishing United States v. Hall and United States v. Shay from the case before it, where it excluded expert testimony regarding credibility of statements, because the defendant in the case before it did not involve expert testimony regarding the voluntariness of a confession).  The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations, see United States v. Adams, 271 F.3d at 1245, whereas a court makes a pretrial determination of the constitutional voluntariness of a statement and, if the court finds that the statement was voluntary, the defendant may challenge the statement's reliability at trial, see Crane v. Kentucky, 476 U.S. at 688-89 ("[D]ue process . . .  requires 'that a jury [not] hear a confession unless and until the trial judge [or some other independent decisionmaker] has determined that it was freely and voluntarily given.'").[6]  The jury does not decide the constitutional voluntariness; they decide only factual voluntariness to assess the statement's reliability and credibility.  The Tenth Circuit's distinction between testimony regarding credibility and testimony regarding voluntariness is thus consistent with the pattern jury

---

that the confession is voluntary.

[6] The due-process voluntariness test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession."  Dickerson v. United States, 530 U.S. 428, 434 (2000)(internal quotations omitted)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  "The due process test takes into consideration the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation."  Dickerson v. United States, 530 U.S. at 434  (internal quotations omitted)(citations omitted).  The Court must weigh "the circumstances of pressure against the power of resistance of the person confessing."  Dickerson v. United States, 530 U.S. at 434 (internal quotations omitted)(quoting Stein v. New York, 346 U.S. 156, 185 (1953)).

instructions.  An expert may testify about mental or physical conditions which may bear on the
voluntariness of the statement, because the area of voluntariness is not in the exclusive province of
the jury; a court makes a pretrial determination of the voluntariness of a statement and the jury
considers the statement only if the court finds that the statement was voluntary under the
Constitution.  When the jury plays its role in the voluntariness analysis, an expert may have
specialized knowledge regarding suggestibility of which the jurors are not aware; however, an expert
may not opine on the credibility of a confession, as that is in the exclusive province of the jury.[7]

———————————————

[7] Instruction 1.25 in the 2005 Tenth Circuit Pattern Jury Instructions stated:

> Evidence has been presented about a statement attributed to the defendant
> alleged to have been made after the commission of the crime (or crimes) charged in
> this case but not made in court.  Such evidence should always be considered by you
> with caution and weighed with care.  Any such statements should be disregarded
> entirely unless the other evidence in the case convinces you by a preponderance of
> the evidence that the statement was made knowingly and voluntarily.
>
> In determining whether any such statement was knowingly and voluntarily
> made, consider, for example, the age, gender, training, education, occupation, and
> physical and mental condition of the defendant, and any evidence concerning his
> treatment while under interrogation if the statement was made in response to
> questioning by government officials, and all the other circumstances in evidence
> surrounding the making of the statement.
>
> If, after considering all this evidence, you conclude by a preponderance of the
> evidence that the defendant's statement was made knowingly and voluntarily, you
> may give such weight to the statement as you feel it deserves under all the
> circumstances.

Tenth Circuit Pattern Jury Instructions Criminal § 1.25, at 41 (2005 Edition).  Instruction 1.25 in the
2011 Tenth Circuit Pattern Jury Instructions states:

> Evidence has been presented about a statement attributed to the defendant
> alleged to have been made after the commission of the crime (or crimes) charged in
> this case but not made in court.  Such evidence should always be considered by you
> with caution and weighed with care.  You should give any such statement the weight
> you think it deserves, after considering all the circumstances under which the
> statement was made.

-38-

The United States argues that Dr. Roll did not "find any mental disease or defect," Tr. at

57:22-24 (Torrez), but Dr. Roll testified that he found mental defects, such as retarded attention

---

        In determining whether any such statement is reliable and credible, consider factors bearing on the voluntariness of the statement. For example, consider the age, gender, training, occupation, and physical and mental condition of the defendant, and any evidence concerning his treatment while under interrogation if the statement was made in response to questioning by government officials, and all the other circumstances in evidence surrounding the making of the statement.

        After considering all this evidence you may give such weight to the statement as you feel it deserves under all the circumstances. If you determine that the statement is unreliable or not credible, you may disregard the statement entirely.

Tenth Circuit Pattern Jury Instructions Criminal § 1.25, at 40 (2011 Edition). The Court had its law clerk speak to Professor Stephen Cribari, Reporter for the Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, to see how this change occurred. The Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit changed the instruction in response to an inquiry from the Honorable David M. Ebel, Senior United States Court of Appeals Judge, based on his reading on Crane v. Kentucky, 476 U.S. 683 (1986). See Electronic Mail Transmission from Stephen Cribari, Reporter for the Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, to the Court (July 30, 2011, 14:34 MST)(Doc. 131)("Cribari Email"). The difference between the instructions reflect what the Committee perceived to be a change in its understanding of Lego v. Twomey, 404 U.S. 477 (1972), which appeared to allow the jury to reconsider the court's finding of voluntariness once it considered the totality of the evidence. See Cribari Email at 1. The Committee believed that a post-Crane v. Kentucky reading of Lego v. Twomey suggested that the jury should not revisit the court's voluntariness ruling, but, rather, considering all circumstances, the jury should limit its consideration to the weight and credibility, and not include voluntariness. See Cribari Email at 1. The Committee believes that this distinction is without practical difference, because, read either way, the jury may in effect reject a defendant's confession as without weight or credibility, and for the very reasons argued to the Court in a suppression motion. See Cribari Email at 1. The difference between the two instructions is that, under the former interpretation, the jury would have revisited the issue of voluntariness and, finding the confession involuntary, rejected the defendant's confession whereas, under the more recent interpretation, the jury rejects the defendant's confession as lacking weight and credibility after having been allowed to consider the defendant's confession, because the court found it voluntary. See Cribari Email at 1. The Court does not believe that these changes affect the Tenth Circuit's distinctions in United States v. Adams and United States v. Benally. The jury still determines factual voluntariness to assess the statement's reliability and credibility. An expert may have specialized knowledge regarding suggestibility of which the jurors are not aware, and this instruction did not place voluntariness in the exclusive province of the jury.

span, depression, and low self-concept, and that everything he listed is a defect, even though every

defect he listed is not in the DSM-IV, see Tr. at 58:2-19 (Torrez, Roll).   Based on standard

psychological tests, Dr. Roll identified mental defects such as low verbal skills, deficit in attention

and concentration, impairment-of-reality testing capacities, depression, and personality features such

as a low estimate of personal worth -- which may, without ameliorating situational factors, have led

left Ganadonegro vulnerable to suggestion.   See Report at 1-3; Notice at 1.   Unlike United States

v. Benally, where the Tenth Circuit distinguished United States v. Hall and United States v. Shay,

because the defendant did not identify a medical condition that contributed to his decision to

confess, Dr. Roll has identified several mental defects that may have contributed to Ganadonegro's

decision to confess.   The Court thus finds that, insofar as Dr. Roll's testimony relates to "the

existence of . . . identifiable medical disorder[s]" or defects which "raise[ ] a question regarding

[Ganadonegro's] cognitive voluntariness," the testimony is admissible.   United States v. Benally,

541 F.3d at 995-96.

How this distinction between expert testimony offered regarding credibility and regarding

voluntariness plays out in this case is that Dr. Roll will not be able to talk generally about the

phenomenon of false confessions and that Ganadonegro fits the profile of someone who would give

a false confession.   Dr. Roll cannot suggest in his testimony that the confession is wrong, a lie, false,

not credible, or unreliable.   He may, however, give the results of his tests, the existence of

identifiable medical disorders in the form of mental defects, and what these mean.   He then will have

to stop there.   The rest will have to be left to Ganadonegro to argue in closing that the statement was

not voluntary.

IV.    **THE COURT WILL NOT EXCLUDE DR. ROLL'S TESTIMONY RELATING TO THE VOLUNTARINESS OF GANADONEGRO'S STATEMENTS UNDER RULE 403.**

The United States argues that, even if the Court were to conclude that Dr. Roll's testimony clears the rule 702 hurdle, the Court should nevertheless exclude the testimony on the grounds that the unfair prejudice the United States would suffer as a result of its admission substantially outweighs any probative value that Ganadonegro may gain by its introduction.  Ganadonegro argues that the United States will suffer no prejudice from the admission of Dr. Roll's opinion, because he is not vouching for Ganadonegro's credibility or telling the jury whether any of Ganadonegro's statements to the FBI agents are false.  Ganadonegro asserts that, on the contrary, Dr. Roll is prepared only to offer the jury some factors to consider when they are deciding whether Ganadonegro's statements are voluntary.  Ganadonegro argues that the exclusion of Dr. Roll's testimony will deprive him of his fundamental constitutional right to present a complete defense to the criminal charges against him.

Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.  Unlike United States v. Benally, where the Tenth Circuit found that whatever relevance Dr. Davis' testimony had was minimal, because Dr. Davis did not examine the defendant, and was not going to specifically discuss him or the circumstances surrounding his confession in her testimony, Dr. Roll has evaluated and examined Ganadonegro, and will testify to his evaluation of Ganadonegro and to Ganadonegro's verbal abilities, level of intelligence and personality structure.  The Tenth Circuit's pattern jury instruction regarding the voluntariness of a defendant's statement states that, in determining whether any such statement is reliable and credible,

the jury should consider factors bearing on the voluntariness of the statement, such as the defendant's age, gender, training, education, physical and mental condition, and any evidence concerning his treatment while under interrogation.  See Jury Instruction 1.25, at 40.  Because Dr. Roll will offer testimony regarding factors for the jury to consider in deciding whether Ganadonegro's confession was voluntary, this evidence has more than minimal relevance.

Although the evidence will be prejudicial to the United States, the Court cannot say that the prejudice to the United States will substantially outweigh the probative value of the evidence. Evidence that one party presents in support of its position invariably prejudices the opposing party. Dr. Roll will not opine that Ganadonegro's statements should be disregarded as untrue.  See United States v. Benally, 541 F.3d at 995 ("Even if we were to assume the limited relevance of this general testimony, we conclude that a district court could reasonably conclude that the prejudice to the prosecution that would result from permitting an expert to opine that prior confessions should essentially be disregarded because they are just as likely to be true as untrue, substantially outweighs the testimony's minimal probative value.").  Rather Dr. Roll will be limited to explaining to the jury who Ganadonegro is as a person; it will be Ganadonegro's attorney who may argue that the statement was not given voluntarily.  The Court will allow Dr. Roll to present testimony regarding the identifiable medical disorders in the form of mental defects which may raise questions regarding Ganadonegro's voluntariness, but the determination of voluntariness will be left to the jury.  If the United States seeks a limiting instruction, the Court will include one, which will help allay any undue influence on the jury.  See United States v. Adams, 271 F.3d at 1243 ("Yet another rationale for exclusion is that the testimony of impressively qualified experts on the credibility of other witnesses is prejudicial, unduly influences the jury, and should be excluded under Rule 403.").  It appears that, at trial, the United States will introduce Ganadonegro's statements.  "[T]he

-42-

Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" <u>Crane v. Kentucky</u>, 476 U.S. at 690 (citation omitted), and if the United States introduces Ganadonegro's statements, Ganadonegro should be able to present evidence regarding the "physical and psychological environment that yielded the confession," <u>United States v. Adams</u>, 271 F.3d at 1244 (citation omitted).  The jury will then decide the ultimate factual issue of Ganadonegro's guilt or innocence.  The Court thus finds that the probative value of Dr. Roll's testimony, insofar as it relates to voluntariness, is not substantially outweighed by danger of undue prejudice to the United States.

**IT IS ORDERED** that the United States' Sealed Motion to Exclude Expert Testimony of Samuel Roll, filed February 15, 2011 (Doc. 101), is granted in part and denied in part.  The Court will exclude Dr. Samuel Roll's testimony insofar as it goes to the credibility of Defendant Kalvest Ganadonegro's statements.  Dr. Roll will not be allowed to testify generally about the phenomenon of false confessions or that Ganadonegro fits the profile of someone who would give a false statement.  The Court will not exclude Dr. Roll's testimony, insofar as it relates to the voluntariness of Ganadonegro's statements.  Dr. Roll may testify as to the tests he concluded on Ganadonegro, the results of these tests, and any identifiable medical disorders or defects that Ganadonegro has.

_____
UNITED STATES DISTRICT JUDGE

-43-

*Counsel:*

Kenneth J. Gonzales
  United States Attorney
Jennifer M. Rozzoni
Presiliano Torrez
  Assistant United States Attorneys
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Kari Converse
Brian A. Pori
  Assistant Federal Public Defenders
Albuquerque, New Mexico

*Attorneys for the Defendant*