**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                              No. CR 09-0312 JB

KALVEST GANADONEGRO,

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss, filed January 3, 2012 (Doc. 228)("Motion"). The Court held a hearing on February 2, 2012. The primary issues are: (i) whether the Court should dismiss the Superseding Indictment, filed November 9, 2011 (Doc. 201), on the basis that the multiple theories of prosecution contained in the Superseding Indictment violate Defendant Kalvest Ganadonegro's due-process rights; (ii) whether the Court should require Plaintiff United States of America to elect a single theory of criminal liability to present to the jury in the re-trial of this case; and (iii) if the Court does not dismiss the Superseding Indictment, whether the Court should permit Ganadonegro to use statements the United States made in the previous trial of this case as prior inconsistent statements or as admissions by party opponents. The Court will grant the Motion in part and deny the Motion in part. The Court will not dismiss any claims in the Superseding Indictment on the basis that the charges create the potential for due-process violations. Because cumulative punishment for both Counts 1 and 2 would result in a double-jeopardy violation, the Court will ensure that the jury instructions inform the jury that they may not convict Ganadonegro on both Counts 1 and 2. The Court will not, however, dismiss any Counts or require the United States to elect certain Counts to present at trial. Because the United

States' statements in the previous trial are admissions by party opponents, the Court will permit Ganadonegro to use the one statement he has informed the Court he plans to use as evidence in the upcoming trial. Ganadonegro should not in any way mention or imply that there was a previous trial or that the statement was made to a jury. Any additional statements Ganadonegro seeks to offer from the prosecution's prior opening statement or closing argument will likewise be subject to the restrictions contained in rule 401 and 403 and must be pre-approved by the Court.

## PROCEDURAL BACKGROUND

Ganadonegro went to trial on charges of intentional child abuse, charged as first-degree murder, on September 1, 2011. See Clerk's Minutes, filed September 1, 2011 (Doc. 192). The jury hung, and the Court declared a mistrial. See Jury Notes at 2-4, filed September 13, 2011 (Doc. 194). Ganadonegro represents that "only one juror voted to find Mr. Ganadonegro guilty of the charge contained in the Indictment." See Motion to Continue Trial at 2, filed January 17, 2012 (Doc. 234). The United States represents: "Later discussion with the jurors revealed that the majority believed that the Defendant had, in fact, inflicted the fatal injuries to Q.S." United States' Response to Motion to Dismiss Count 3, filed December 20, 2011 (Doc. 225). On October 9, 2011, the United States superseded the indictment with a new one charging three separate charges: (i) second-degree murder in violation of 18 U.S.C. § 1111; (ii) voluntary manslaughter in violation of 18 U.S.C. § 1112; and (iii) negligent child abuse resulting in death in violation of N.M.S.A. 1978, § 30-6-1(D)(1) and 18 U.S.C. §§ 13 and 1153. See Superseding Indictment at 1-2.

On January 3, 2012, Ganadonegro filed his Motion seeking dismissal of the Superseding Indictment. Ganadonegro contends that the Superceding Indictment advances a theory of criminal liability which is manifestly inconsistent with the theory of guilt that United States advanced at the first trial. See Motion at 6-11. Ganadonegro argues that, in charging him with the Counts in the

Superseding Indictment, the United States has acted in a fundamentally unfair manner and has deprived him of his constitutional right to due process of law.  See Motion at 6-11.  He argues that "the doctrine of collateral estoppel should bar a prosecutor from arguing a different theory of liability in a subsequent criminal prosecution if the government's trial theories are 'inherently factually contradictory' and 'irreconcilable.'"  Motion at 7-8.  He argues that there has been no newly discovered evidence that justifies the additional Counts in the Superseding Indictment.  See Motion at 10.  Ganadonegro contends that, in the alternative, because the Superceding Indictment is multiplicitous, the Court should either dismiss the Superceding Indictment or require that the United States elect a single theory of criminal liability to present to a jury in the re-trial.  See Motion at 11-12.  Finally, if the Court chooses not to dismiss the Superseding Indictment, Ganadonegro seeks the Court's permission "to introduce portions of the Government's opening and closing arguments from the first trial which are inconsistent with any theory of guilty the Government intends to advance in this case."  Motion at 13.  He contends that the statements are admissible either as prior inconsistent statements or as admissions by party opponent.  See Motion at 1, 13-14.

On January 11, 2012, the United States filed its Response.  See United States' Response to Motion to Dismiss [Doc. 228] (Doc. 233)("Response to Motion to Dismiss").  The United States contends that the present theories which it intends to present at trial to the jury are not mutually inconsistent theories of guilt.  See Response at 2.  It notes that it has not filed a new witness list and that its presentation of evidence at the upcoming trial "will be substantially identical."  Response at 2.  It asserts that its "theory remains as it has been throughout the pendency of the case: that Defendant, acting alone, killed 10-month-old Q.S. with his bare hands, by shaking her and throwing her." Response at 3.  It contends that "[t]he only difference between the allegations the government presented in the first trial and will present in the second trial will be the alleged state of mind

Defendant possessed when he killed Q.S." Response at 2-3. The United States argues that Ganadonegro's "subjective state of mind is uniquely known to Defendant and uniquely elusive to the prosecution," and that it must prove his state of mind circumstantially. Response at 3. It notes that Ganadonegro reversed his position at trial in comparison to the statements he made to federal agents and asserted that he never shook Q.S. See Response at 3. The United States contends that "[t]his stunning reversal constitutes new evidence that independently warrants a change in theory of liability." Response at 3. It asserts that Ganadonegro has cited distinguishable authority in support of his arguments for dismissal. See Response at 3-4. Specifically, the United States contends that the authority he cites involves: (i) an initial conviction; (ii) two different defendants; and (iii) differences in the prosecution's presentation of objective facts. See Response at 3-4. It contends that the authority upon which Ganadonegro relies deals with factually inconsistent theories as opposed to different legal theories for a prosecution. See Response at 4-5. The United States argues that Ganadonegro has not presented in sufficient detail his argument for admissibility of the prosecution's statements from the opening statement and from the closing argument in the prior trial. See Response at 6-7. It asserts that he should identify the statements he seeks to admit and provide additional justification why those statements are admissible. See Response at 6-7. Additionally, it argues that, other than the mens rea it seeks to prove, there is no inconsistency between the theories it has asserted at the previous trial and will assert at the upcoming trial. See Response at 7. The United States contends that admitting such statements will needlessly complicate the trial, including forcing the attorneys presenting the case to testify. See Response at 7. Regarding the argument on multiplicity, the United States incorporates by reference its argument in the United States' Response to Motion to Dismiss Count 3, filed December 20, 2011 (Doc. 225)("Response to Motion to Dismiss Count 3").

In its Response to Motion to Dismiss Count 3, the United States argues that the charged offenses in the Superseding Indictment are not multiplicitous, as they each contain elements distinct from the others.  See Response to Motion to Dismiss Count 3, at 7.  The United States contends that no violation of the Sixth Amendment to the United States Constitution arises from these offenses under the applicable test from Blockburger v. United States, 284 U.S. 299 (1932).  See Response to Motion to Dismiss Count 3, at 7-8.  It contends that, under this test, each of the statutes on which it relies to charge offenses requires proof of an additional fact that the others do not.  See Response to Motion to Dismiss Count 3, at 7-8.  It also asserts that the Double Jeopardy Clause does not prohibit the prosecution from proceeding on several charges against a defendant, including lesser included offenses.  See Response to Motion to Dismiss Count 3, at 9.  It asserts that the proper procedural solution if the jury convicts Ganadonegro on inconsistent legal theories is for the Court to vacate one of those convictions.  See Response to Motion to Dismiss Count 3, at 9.

On January 31, 2012, Ganadonegro filed his Reply.  See Defendant's Reply to the Government's Response to the Motion to Dismiss (Doc. 242)("Reply").  He asserts that the United States puts forward an implausible argument that, "so long as it relies on the same factual predicate, it is free to stand before different juries and argue different criminal theories of liability without the second jury ever learning that the Government previously presented an inconsistent theory of guilt." Reply at 2.  It argues that fundamental fairness requires that a defendant be able to present evidence of the inconsistent theories which the prosecutor made before a jury in a previous trial.  See Reply at 2.  Ganadonegro further emphasizes that the United States seeks to assert fundamentally inconsistent and irreconcilable theories.  See Reply at 3-4.  He clarifies that he "seeks to inform the jury that, at a previous trial of this matter, the prosecution argued that he was guilty of first degree murder and that the Government has now abandoned that argument in favor of other theories of

criminal liability." Reply at 5.  He also seeks to admit, for the purposes of rebutting any inconsistent argument that the United States makes at the upcoming trial, a statement from prosecutors in closing argument that "justice demands that you convict him of first degree, intentional child abuse because he shook her knowingly, intentionally, and willfully."  Reply at 5-6.

At the hearing on February 2, 2012, Ganadonegro emphasized, in support of his due-process argument, that a jury may be confused when it is dealing with multiple crimes that require different levels of mens rea.  See Transcript of Hearing at 4:1-15 (taken February 2, 2012)(Converse)("Tr.").[1] The Court questioned whether the jury would have significant difficulty sorting out these issues given that juries commonly deal with multiple counts.  See Tr. at 4:16-20 (Court).  Ganadonegro emphasized that Count 3, which incorporates state child-abuse requirements, will particularly confuse the jury.  See Tr. at 4:21-5:5 (Converse).  He contended that the United States cannot, consistent with due process, stand before one jury and argue one theory for conviction, and then stand before another jury and argue a different theory.  See Tr. at 37:4-22 (Pori).  He contended that permitting the prosecution to so argue undermines confidence in the judicial system.  See Tr. at 37:23-38:13 (Pori).  The Court inquired whether the United States should be punished for putting forward the wrong theory for conviction in a first trial, which results in a mistrial, and then learn from that process and charge a lower offense.  See Tr. at 39:4-11 (Court).  Ganadonegro conceded that there would be no material factual inconsistency in the United States' upcoming presentation of its case compared to that in the previous trial, but noted that there was a legal inconsistency.  See Tr. at 38:14-19, 39:12-25 (Pori).

The Court inquired how Ganadonegro planned to use the prosecutor's statements from the

---

[1]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

previous trial in the upcoming trial.  See Tr. at 40:1-14 (Court).  Ganadonegro stated that the only statement he currently planned to use were statements to the effect that the United States proceeded on a first-degree murder theory at the previous trial and other related statements regarding his mens rea.  See Tr. at 40:19-25 (Pori).  The Court asked for clarification whether Ganadonegro intended to read only statements the attorneys had made in closing argument, to which Ganadonegro responded that he planned to do so.  See Tr. at 41:1-8 (Court, Pori).  Ganadonegro agreed that he would not discuss that a previous trial occurred, that there was a mistrial,  or what the division of the jury was.  See Tr. at 41:9-14 (Court, Pori).  Ganadonegro asserted that he would use these statements to illustrate that the United States has admitted that it was wrong in terms of the theory on which it proceeded at the first trial and that it could be wrong again.  See Tr. at 41:23-42:13 (Pori).  He asserted that the jury should be able to consider this evidence.  See Tr. at 42:14-21 (Pori). The Court expressed hesitance in permitting Ganadonegro to assert that the jury concluded that the United States was wrong in proceeding on the previous theory.  See Tr. at 42:22-43:1 (Court). Ganadonegro stated that he believes that he would be able to present this evidence without making an argument to the effect that the jury concluded that the United States was wrong.  See Tr. at 43:1-19 (Pori).  He reiterated that the essence of due process in these circumstances is fairness and reciprocity.  See Tr. at 44:4-14 (Pori).  Ganadonegro reiterated that his multiplicity argument has both a due-process and a double-jeopardy aspect.  See Tr. at 45:2-14 (Pori).  He asserted that it is improper for the United States to proceed on all the theories contained in the Superseding Indictment and that they should have to elect a particular theory on which they will proceed.  See Tr. at 45:21-46:17 (Pori).  He contended that the jury should be aware, under the rule governing admissions by party opponents, of the inconsistent arguments which the United States has made.  See Tr. at 46:17-47:1 (Pori).

The United States asserted that it should not be bound by the previous theory it pursued at the trial which ended in a mistrial.  <u>See</u> Tr. at 47:4-9 (Pena).  It argued that a search for the truth requires that it be able to proceed on a different theory if the case develops in a manner where an alternate theory is more plausible.  <u>See</u> Tr. at 47:4-16 (Pena).  It noted that many of the cases Ganadonegro has cited involve much different circumstances, where there are irreconcilable inconsistencies among prosecutors' arguments in trials of different defendants -- a situation which it argued is distinguishable from the one before the Court.  <u>See</u> Tr. at 47:17-24 (Pena).  It contended that different mens rea requirements are not factual inconsistencies.  <u>See</u> Tr. at 47:25-48:6 (Pena). It asserted that Ganadonegro has injected factual inconsistencies in the case when one considers the statements he made to federal agents regarding whether he shook Q.S. compared to statements he made at trial about that subject.  <u>See</u> Tr. at 48:7-49:1 (Pena).  The United States argued that it is highly unusual for a court to allow a prosecutor's arguments from a previous trial as evidence in a subsequent trial.  <u>See</u> Tr. at 49:5-16 (Pena).  The Court noted that there may be natural checks and balances in place that prevent this issue from arising frequently, as there are few retrials, and a defendant may not want information from a previous trial made available to the jury.  <u>See</u> Tr. at 50:10-17 (Court).  The United States asserted that this evidence would also be subject to rules 401 and 403 of the Federal Rules of Evidence.  <u>See</u> Tr. at 50:18-51:12 (Pena).  The United States asserted that, if the Court is inclined to allow these statements in as evidence, it should apply the analysis that the United States Court of Appeals for the Second Circuit did in <u>United States v. McKeon</u>, 738 F.2d 26 (2d Cir. 1984), in terms of putting in place procedural safeguards before allowing in this evidence.  <u>See</u> Tr. at 52:7-53:4 (Pena).

The Court noted that it is common in civil cases for attorneys to have to remain conscious that their arguments could at some point be used at a later time against their client.  <u>See</u> Tr. at 53:9-

16 (Court).  The Court also noted that the United States is different from many clients in terms of how much authority the United States Attorney's Office has in asserting the position of the client. See Tr. at 53:19-23 (Court).  The United States argued that a prosecutor is not necessarily a proper agent of the party for purposes of the admission by party opponent rule.  See Tr. at 53:24-54:4 (Pena).  The United States contended that closing arguments are not evidence.  See Tr. at 54:8-15 (Pena).  The United States also emphasized the difficulties that could arise in admitting statements from prior proceedings that do not occur before a jury.  See Tr. at 54:16-55:1 (Pena).  Ganadonegro countered that there is a clear distinction between statements a prosecutor makes in pretrial proceedings as opposed to statements he or she makes in front of a jury.  See Tr. at 55:14-22 (Pori). He asserted that worse complications arise from hiding this evidence from the jury.  See Tr. at 55:22-56:8 (Pori).  The United States contended that allowing in this evidence could result in a variety of procedural problems, including the necessity of having prosecutors explain their statements and of addressing internal United States Attorney's Office policies.  See Tr. at 60:1-21 (Pena).  Ganadonegro represented that he would not call any prosecutors as witnesses, would not inquire into prosecutorial charging decisions, and would object to the prosecutors arguing in favor of their own credibility in closing argument.  See Tr. at 61:5-10 (Pori).

## DUE-PROCESS RESTRICTIONS ON INCONSISTENT PROSECUTORIAL ARGUMENTS

Some courts have recognized that due process prevents the prosecution from presenting inherently factually contradictory theories in different criminal trials.  See Smith v. Groose, 205 F.3d 1045, 1052 (8th Cir. 2000).  As the United States Court of Appeals for the Eighth Circuit has stated, however, this restriction applies only in limited circumstances and almost exclusively in cases involving multiple defendants.  Smith v. Groose, 205 F.3d at 1051-52.  The Eighth Circuit provides

a helpful factual illustration of a typical case where such a violation arises and explains how

infrequently these situations arise:

> Smith contends that this manipulation of the evidence deprived him of due process and rendered his trial fundamentally unfair. We agree. The State's use of factually contradictory theories in this case constituted "foul blows," error that fatally infected Smith's conviction. Even if our adversary system is "in many ways, a gamble," that system is poorly served when a prosecutor, the state's own instrument of justice, stacks the deck in his favor. The State's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth.

> Suppose, for example, that the prosecutor had argued a murder theory based on Lytle's December 2, 1983, statement to convict Smith in Courtroom A in the morning, then walked upstairs to Courtroom B and argued a contradictory murder theory based on Lytle's November 30, 1983, statement to convict Cunningham in the afternoon? Again, suppose that Smith and Cunningham had been tried jointly. Would the prosecutor have been entitled to ask the jury to accept as true both of Lytle's accounts of who had murdered the Chamberses in an attempt to secure convictions of both Smith and Cunningham?

> We do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather, we hold only that the use of inherently factually contradictory theories violates the principles of due process. For example, the passage of time between trials, such as the four months' time between Smith's trial and Cunningham's, may be a legitimate excuse for minor variations in testimony or defects in memory, as seems to have occurred in <u>Albanese</u>. In Smith's case, however, the relevant variation was neither minor nor found in the testimony at trial.

> Smith's situation is unusual, and we doubt that claims such as his will often occur. To violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime. In the present case, the State's zeal to obtain multiple murder convictions on diametrically opposed testimony renders Smith's convictions infirm. "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."

<u>Smith v. Groose</u>, 205 F.3d at 1051-52 (citations omitted). Other federal courts and judges have

reached similar conclusions. See <u>Thompson v. Calderon</u>, 120 F.3d 1045, 1057-59 (9th Cir.

1997)("Here, little about the trials remained consistent other than the prosecutor's desire to win at

any cost."), rev'd on other grounds 523 U.S. 538 (1998); Drake v. Kemp, 762 F.2d 1449, 1478-79 (11th Cir. 1985)(Clark, J., concurring)("As the state habeas judge recognized, the prosecution's theories of the same crime in the two different trials negate one another.  They are totally inconsistent.  This flip flopping of theories of the offense was inherently unfair.").

Courts have taken a realistic approach to applying these due-process restrictions given the facts of a particular case.  Courts presented with situations where there are genuine evidentiary disputes as to who was responsible for a crime among various defendants have shown greater willingness to permit a prosecutor to argue inconsistent theories in separate trials.  See Beathard v. Johnson, 177 F.3d 340, 348 (5th Cir. 1999)("The record does not support such a claim.  Price had two live eyewitnesses to the crime, both charged with capital murder and both accusing the other of being the most culpable. . . . Price, as well as every juror involved, knew that both of the stories could not have been true."); Parker v. Singletary, 974 F.2d 1562, 1578 (11th Cir. 1992)("But no due process violation occurred, because there was no necessary contradiction between the state's positions in the trials of the three co-defendants.  Given the uncertainty of the evidence, it was proper for the prosecutors in the other co-defendants' cases to argue alternate theories as to the facts of the murder.").  Additionally, new evidence or new developments in a case can sometimes justify inconsistent theories at the trials of multiple defendants:

> As to who fired the first shot, it is true that the prosecutor made different arguments at each trial, but it is also true that these arguments were consistent with the evidence actually adduced at each trial.
>
> . . . .
>
>   Nor is it shocking or even unusual that the evidence came in somewhat differently at each trial.  Any lawyer who has ever tried a case knows that trial preparation is not a static process.  As a case evolves, new witnesses come forward; others become unavailable.  As new evidence is uncovered, other evidence loses it significance.  What is received in evidence by stipulation in one trial might draw

vigorous objection in another.

This is not like the prosecutorial misconduct found by this court in Thompson v. Calderon.  In Thompson, we found that in the second trial of defendant Leitch the prosecutor manipulated evidence and witnesses and "essentially ridiculed the theory he had used to obtain a conviction and death sentence at Thompson's trial."  The positions taken by the prosecutor in that case were fundamentally inconsistent because different defendants were charged in separate trials with the same murder that had been committed by an individual.  In this case, both defendants could be guilty of the same crime because of the nature of the crime -- the murder of an innocent bystander during gang warfare.

Nguyen v. Lindsey, 232 F.3d 1236, 1240-41 (9th Cir. 2000)(citations omitted).

## LAW ON DOUBLE JEOPARDY AND MULTIPLICITOUS COUNTS

The Fifth Amendment to the United States Constitution's guarantee that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb," U.S. Const. amend. V.  This amendment protects individuals not only from "successive prosecutions, but also [from] successive punishments for the same offense."  See United States v. Morris, 247 F.3d 1080, 1083 (10th Cir. 2001)(citing United States v. Dixon, 509 U.S. 688, 696 (1993)).  Accordingly, the United States Court of Appeals for the Tenth Circuit's "jurisprudence establishes that multiplicitous sentences violate the Double Jeopardy Clause."  United States v. McCullough, 457 F.3d 1150, 1162 (10th Cir. 2006)(internal quotation marks omitted).  "Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior."  United States v. McCullough, 457 F.3d at 1162 (quoting United States v. Johnson, 130 F.3d 1420, 1424 (10th Cir. 1997)).  "Although multiplicity is not fatal to an indictment, multiplicitous counts which may result in multiplicitous convictions are considered improper because they allow multiple punishments for a single criminal offense."  United States v. McCullough, 457 F.3d at 1162 (internal quotation marks omitted).

The issue of multiplicity may arise when a defendant is faced with an indictment charging multiple violations of the same statute from relatively contemporaneous conduct, such as multiple

assault charges stemming from two episodes concerning a prison guard occurring close in time, see United States v. Segien, 114 F.3d 1014, 1022 (10th Cir. 1997)(discussing multiple 18 U.S.C. § 111 charges), abrogated on other grounds by Jones v. United States, 526 U.S. 227 (1999), or simultaneously mailing to the IRS several different false documents in support of a single tax return, see United States v. Bettenhausen, 499 F.2d 1223, 2134 (10th Cir. 1974).  In such situations, the central question is often whether the underlying conduct is part of the same transaction or comprises distinct episodes that can be punished separately.  See, e.g., United States v. Neha, No. 04-1677, 2007 WL 7017193, at *2-3 (D.N.M. Feb. 18, 2007)(Browning, J.)(concluding that the offenses charged in four counts constituted separate acts and were not multiplicitous charges for the same offensive conduct, because there was more than one rape, because the defendant was the principal in one rape and the aider and abettor in the other, and because the alleged crimes likely did not occur at the same time).

The issue of multiplicity may also arise when the defendant is charged with violations of multiple criminal statutes for the same underlying acts or omissions.  See United States v. Patterson, 760 F.Supp.2d 1116, 1120 (D.N.M. 2009)(Browning, J.).  When confronting such a situation, courts employ a two-step test: "A person may be prosecuted for more than one crime based on the same conduct (1) if each crime requires proof of a fact that the other does not, or (2) if Congress has clearly expressed its intent to impose cumulative punishment for the same conduct under different statutory provisions." United States v. Pearson, 203 F.3d 1243, 1267-68 (10th Cir. 2000)(citations omitted).  When, as is often the case, there is no clearly discernible congressional intent to impose cumulative punishment, courts use the rule of statutory construction described in Blockburger v. United States.  See United States v. Greene, 239 F.App'x 431, 436 (10th Cir. 2007)(unpublished)(citing United States v. Morehead, 959 F.2d 1489, 1506 (10th Cir.1992), aff'd

on reh'g en banc sub nom. United States v. Hill, 971 F.2d 1461 (10th Cir. 1992)).

The Blockburger v. United States rule is often known as the "same elements test."  United States v. Pearson, 203 F.3d at 1268.  "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  Blockburger v. United States, 284 U.S. at 304.  "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."  Blockburger v. United States, 284 U.S. at 304 (internal quotation marks omitted).

As the Supreme Court of the United States has noted, in the related context of determining when a jury instruction for a lesser-included offense may be given, an elements test is "certain and predictable . . . . [b]ecause the elements approach involves a textual comparison of criminal statutes and does not depend on inferences that may be drawn from evidence introduced at trial."  Schmuck v. United States, 489 U.S. 705, 720 (1989).  See United States v. Greene, 239 F.App'x at 436 (discussing Schmuck v. United States in context of the Blockburger v. United States test).  The Supreme Court has clarified, however, that the Blockburger v. United States test applies only to charges or convictions asserting violations of separate statutes, and not to separate subsections of the same criminal provision.  See Sanabria v. United States, 437 U.S. 54, 70 n.24 (1978)(noting that the Blockburger v. United States test is used "to determine whether a single transaction may give rise to separate prosecutions, convictions, and/or punishments under separate statutes").[2]

_____

[2] It may also be the case that a Congressional intent not to allow prosecution for the same transaction under different statutes will trump the elements test.  In Ball v. United States, 470 U.S.

-14-

As an example of the elements test at work, in United States v. Greene, the defendant was charged and convicted for both tax evasion and making a false statement for the same act of filing a form.  239 F.App'x at 436.  The Tenth Circuit held that the convictions were not multiplicitous, because tax evasion required proof of a substantial tax deficiency and an intent to evade taxes, neither of which the other charge required, while the false filing count required proof of knowingly signing a false statement under oath, which was not an element of tax evasion.  See United States v. Greene 239 F.App'x at 437-38.   By contrast,  in United States v. Morehead, 959 F.2d 1489 (10th Cir. 1992), the Tenth Circuit found convictions under both 18 U.S.C. § 856(a)(1) and 18 U.S.C. § 856(a)(2) to be multiplicitous.  See 959 F.2d at 1506-08.  The 18 U.S.C. § 856(a)(2) charge required proof that the defendant knowingly maintained a house for marijuana trafficking, while the 18 U.S.C. § 856(a)(2) charge required proof that the defendant knowingly managed or controlled a house, and rented, leased, or made it available for drug trafficking.  See United States v. Morehead, 959 F.2d at 1507.  The Tenth Circuit held that managing or controlling, and maintaining,

856 (1985), the Supreme Court held that a defendant could not be convicted under both then-18 U.S.C. § 922(h) -- prohibiting felons from receiving firearms -- and then-18 U.S.C. § 1202(a) -- prohibiting felons from possessing firearms -- for the same firearm.  The Supreme Court characterized Blockburger v. United States as indicating an intent against cumulative punishment, because receiving a weapon necessarily involved possessing it, thus making the statutes multiplicitous under Blockburger v. United States.  See Ball v. United States, 470 U.S. at 861-62. The Supreme Court buttressed this position with the congressional intent expressed in legislative history, however, and also indicated that the Blockburger v. United States test was a proxy for the will of Congress.  See Ball v. United States, 470 U.S. at 861-64.  The Blockburger v. United States test thus remains good law, but the decision in Ball v. United States indicates that, if a situation arose where the elements test were satisfied, but there was some other clear expression of Congressional intent not to allow cumulative punishment, then Congressional intent would govern and multiple charges for the same conduct would violate the Fifth Amendment.  The Blockburger v. United States test might be better expressed therefore not as presenting two ways in which cumulative punishment may be allowed -- based on different elements or based on Congressional intent -- but as being a two-step process in which a court first tries to discover the intent of Congress on the question, whether that intent is for or against cumulative punishment, and if that fails, then resorting to the elements test.

were the same, and that, thus, the 18 U.S.C. § 856(a)(2) charge had an additional element -- renting or leasing -- that was not in 18 U.S.C. § 856(a)(1), but that 856(a)(1) did not contain any element that was not part of 18 U.S.C. § 856(a)(2).  Accordingly, the counts were multiplicitous.  See United States v. Morehead, 959 F.2d at 1507.

When confronted with a multiplicitous indictment, a trial court has the discretion to dismiss the multiplicitous counts or to require the government to elect between the multiplicitous counts before trial, or to vacate one of the multiplicitous convictions after trial.  See United States v. Johnson, 130 F.3d at 1426 (citing United States v. Throneburg, 921 F.2d 654, 657 (6th Cir. 1990)).  If the trial court allows multiplicitous charges to go to the jury, however, the options are more limited: "Where multiplicitous convictions are found, 'the only remedy . . . is . . . to vacate one of the underlying convictions as well as the . . . sentence based upon it.'"  United States v. Barrett, 496 F.3d 1079, 1095 (10th Cir. 2007)(alterations in original)(quoting Rutledge v. United States, 517 U.S. 292, 301-02 (1996)).  The risk inherent in a failure to dispose of multiplicitous charges before trial is that it "may falsely suggest to a jury that a defendant has committed not one but several crimes."  United States v. Johnson, 130 F.3d at 1426 (internal quotation marks omitted).  "Once such a message is conveyed to the jury, the risk increases that the jury will be diverted from a careful analysis of the conduct at issue, and will reach a compromise verdict or assume the defendant is guilty on at least some of the charges."  United States v. Johnson, 130 F.3d at 1426 (internal quotation marks omitted).

## LAW REGARDING ADMISSION OF PRIOR STATEMENTS BY A PROSECUTOR

The admission-by-a-party-opponent exclusion from the general hearsay rule is defined as follows:

The statement is offered against an opposing party and:

> (A)     was made by the party in an individual or representative capacity;
>
> (B)     is one the party manifested that it adopted or believed to be true;
>
> (C)     was made by a person whom the party authorized to make a statement on the subject;
>
> (D)     was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
>
> (E)     was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2).  As the Tenth Circuit has stated:

> Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule.   No guarantee of trustworthiness is required in the case of an admission.   The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from restrictive influences of the opinion rule and the rule requiring first-hand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for a generous treatment of this avenue of admissibility.

Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 667 (10th Cir. 2006)(alterations omitted)(internal quotation marks omitted).

The Tenth Circuit has not expressly decided whether government attorneys' statements are admissions by party opponents.  The Tenth Circuit has assumed without deciding "that the government's statements in a brief are admissible as the admission of a party opponent," but noted that "some courts have declined, for reasons of policy, to hold the government to the statements of its agents in criminal cases." In re Antrobus, 563 F.3d 1092, 1099 n.3 (10th Cir. 2009)(citing United States v. Kattar, 840 F.2d 118 (1st Cir. 1988); United States v. Powers, 467 F.2d 1089, 1095 (7th Cir. 1972).  Many circuits have recognized that a defendant may admit statements made by

-17-

government attorneys and some other government agents under the rules for admissions by party

opponents.  In the context of a government memorandum and government brief drafted in another

case by an attorney in the Department of Justice, the United States Court of Appeals for the First

Circuit permitted the use, in a separate criminal case, of these statements by government attorneys

as admissions by party opponent.  See United States v. Kattar, 840 F.2d at 126-27, 130-31.  The First

Circuit stated:

> We first must determine whether the government is a "party-opponent" for
> purposes of this rule in a criminal case.  We agree with Judge Bazelon that "the
> Federal Rules clearly contemplate that the federal government is a party-opponent
> of the defendant in criminal cases."  We can find no authority to the contrary or
> reason to think otherwise.  Whether or not the entire federal government in all its
> capacities should be deemed a party-opponent in criminal cases, the Justice
> Department certainly should be considered such.
>
> Kattar initially argues that the briefs in question contained admissions of
> "agents" of his party-opponent, and were therefore admissible under Rule
> 801(d)(2)(D).  We need not deduce the scope of Rule 801(d)(2)(D), however,
> because the statements here were admissible under Rule 801(d)(2)(B) as statements
> of which the party-opponent "has manifested an adoption or belief in its truth."  The
> Justice Department here has, as clearly as possible, manifested its belief in the
> substance of the contested documents; it has submitted them to other federal courts
> to show the truth of the matter contained therein.  We agree with Justice (then Judge)
> Stevens that the assertions made by the government in a formal prosecution (and, by
> analogy, a formal civil defense) "establish the position of the United States and not
> merely the views of its agents who participate therein."  The inconsistency of the
> government's positions about the Church should have been made known to the jury.
> The government cannot indicate to one federal court that certain statements are
> trustworthy and accurate, and then argue to a jury in another federal court that those
> same assertions are hearsay.

United States v. Kattar, 840 F.2d at 130-31 (footnotes omitted)(citations omitted)(quoting United

States v. Morgan, 581 F.2d 933, 937 n.10 (D.C. Cir. 1978); United States v. Powers, 467 F.2d at

1097 n.1 (Stevens, J., dissenting)).

The United States Court of Appeals for the District of Columbia has similarly rejected

arguments that the government is not a party opponent:

Notwithstanding the plain language of the Rule, the government urges us to hold it inapplicable to the prosecution in criminal cases. The government's position is based on public policy grounds, and has been accepted, it says, by the Courts of Appeals for the Second, Sixth, and Seventh Circuits. All of the cases on which it relies, however, save one, were decided before the Federal Rules of Evidence were made effective by Congress. And that one, United States v. Pandilidis, 524 F.2d 644 (6th Cir. 1975), decided several months after the effective date of the Rules, does not discuss their possible applicability. Moreover, there is nothing in the history of the Rules generally or in Rule 801(d)(2)(B) particularly to suggest that it does not apply to the prosecution in criminal cases.

United States v. Morgan, 581 F.2d at 937-38 (footnotes omitted). The United States Court of Appeals for the Second Circuit "has recognized that the government's attorneys can bind the government with their in-court statements" under the rules for admissions by party opponents. See United States v. Yildiz, 355 F.3d 80, 82 (2d Cir. 2004). In a somewhat different context than the rules regarding admissions by party opponents, the United States Court of Appeals for the Fourth Circuit has held: "Further, a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party." United States v. Blood, 806 F.2d 1218, 1221 (4th Cir. 1986). In comparison, the United States Court of Appeals for the Seventh Circuit has stated: "Based on the common law principle that no individual should be able to bind the sovereign, we generally decline to apply Rule 801(d)(2) to statements made by government employees in criminal cases." United States v. Zizzo, 120 F.3d 1338, 1351 n.4 (7th Cir. 1997). The Seventh Circuit commented, however, "that a number of courts have rejected that approach when dealing with statements made by government attorneys." United States v. Zizzo, 120 F.3d at 1351 n.4.

Several circuit courts have declined to permit certain individuals to qualify as the government's agent for purposes of the rule on admissions by party opponents, such as government investigators on which the Department of Justice did not rely or government informants. See United

States v. Garza, 448 F.3d 294, 298-99 (5th Cir. 2006)("The results of his investigation were never adopted by the Department of Justice, and no prosecution was recommended. It hardly seems within the spirit of Rule 801(d)(2)(D) to admit Grimes' opinion regarding Officer Ragsdale's veracity as an admission by the Government."); United States v. Yildiz, 355 F.3d at 81-82 (distinguishing "informant's remarks" from "sworn statements submitted to a judicial officer"); Lippay v. Christos, 996 F.2d 1490, 1499 (3d Cir. 1993)("We do not believe that the authors of Rule 801(d)(2)(D) intended statements by informers as a general matter to fall under the rule, given their tenuous relationship with the police officers with whom they work.").

Some courts have chosen to impose additional limitations on the admissibility of opening statements and closing arguments made in previous criminal trials. The Second Circuit has been the primary circuit court that has dealt with admissibility of prior closing arguments and opening statements in a subsequent criminal trial. See, e.g., United States v. McKeon, 738 F.2d at 33. It has recognized "that prior opening statements are not per se inadmissible in criminal cases," because "[t]o hold otherwise would not only invite abuse and sharp practice but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking procedures." United States v. McKeon, 738 F.2d at 31. It qualified this statement, however, when it said that it was "not willing . . . to subject such statements to the more expansive practices sometimes permitted under the rule allowing use of admissions by a party-opponent." United States v. McKeon, 738 F.2d at 31. In adopting restrictions on the use of this evidence, the Second Circuit expressed some skepticism towards the general policy behind the rule governing admissions by party opponents:

> [W]e note that the admissions rule is itself something of an anomaly since it is in some respects an exception to the general proposition that probative value and reliability are the touchstone of the law of evidence where non-privileged matters are concerned. . . . Why probative value and reliability carry so little weight in the case of the admissions rule is not clear, particularly since the use of admissions may be

> the trial equivalent of a deadly weapon. In all probability, these aspects of the rule
> are derived vestigially from an older, rough and ready view of the adversary process
> which leaves each party to bear the consequences of its own acts, no matter how
> unreliable these acts may be as proof.

United States v. McKeon, 738 F.2d at 32.  As a safeguard on the use of these prior arguments evidence, the Second Circuit imposed various restrictions on their use: (i) "the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial"; (ii) the district court must determine "that the statements of counsel were such as to be the equivalent of testimonial statements" made by the client; and (iii) "the district court must determine by a preponderance of the evidence that the inference that the proponent of the statements wishes to draw 'is a fair one and that an innocent explanation for the inconsistency does not exist.'"

United States v. Ford, 435 F.3d 204, 215 (2d Cir. 2006).  The Second Circuit has further held: "[S]peculations of counsel, advocacy as to the credibility of witnesses, arguments as to the weaknesses in the prosecution's case or invitations to a jury to draw certain inferences should not be admitted."  United States v. McKeon, 738 F.2d at 33.  The United States Court of Appeals for the Eleventh Circuit has adopted many of these same restrictions that the Second Circuit has set out. See United States v. DeLoach, 34 F.3d 1001, 1005 (11th Cir. 1994)(quoting United States v. McKeon, 738 F.2d at 33).  The Fourth Circuit adopted the reasoning in United States v. McKeon to the extent that it has recognized that "a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party."

United States v. Blood, 806 F.2d at 1221.

      As justification for these restrictions, the Second Circuit provided the following policy rationale:

> First, the free use of prior jury argument might consume substantial time to
> pursue marginal matters.  Some witnesses may be available only at one trial, their

testimony may change or other evidence may differ.  Trial tactics may also change because of the earlier trial.  If prior jury argument may be freely used for evidentiary purposes, later triers of fact will be forced to explore the evidence offered at earlier trials in order to determine the quality of the inconsistency between positions taken by a party.  This will result in a substantial loss of time on marginal issues, diversion from the real issues and exposure to evidence which may be otherwise inadmissible and prejudicial.

Second, inferences drawn from an inconsistency in arguments to a jury may be unfair.  In criminal cases, the burden rests on the government to present a coherent version of the facts, and defense counsel may legitimately emphasize the weaker aspects of the government's case.  Where successive trials occur, the evidentiary use of earlier arguments before the jury may lead to seemingly plausible but quite prejudicial inferences.  A jury hearing that in the first trial defense counsel emphasized the weakness of the prosecution's case as to the defendant's criminal intent, may well, when lack of proof of identity is argued at the second, be misled as to the government's obligation to prove all the elements at both trials.

Third, the free use of prior jury argument may deter counsel from vigorous and legitimate advocacy.  Argument to the jury is a crucial aspect of any trial, and the truth-seeking process itself demands that the professional adversaries be allowed to put before the trier of fact all relevant argument regarding the inferences or factual conclusions possible in a particular case.  Counsel should not, except when the truth-seeking purpose clearly demands otherwise, be deterred from legitimate argument by apprehension about arguments made to a jury in an earlier trial.

Fourth, where an innocent factual explanation of a seeming inconsistency created by the prior opening statement exists, the offer of that explanation may seriously affect other rights of the defense.  Where the explanation may be offered to the trier of fact only through the defendant as a witness, the defendant may have to choose between forgoing the explanation or facing the introduction of a prior criminal record for impeachment purposes and waiver of the attorney-client privilege.  Even if defense counsel can offer the explanation in a hearing under Fed. R. Evid. 104(a) outside the presence of the jury, that offer may expose work product, trial tactics or legal theories to the prosecution.  These Hobson's choices may thus seriously impair the defense.

Fifth, as is clear from our disposition of this case, the admissibility of a prior opening statement may lead to the disqualification of counsel chosen by the defendant, a most serious consequence.

United States v. McKeon, 738 F.2d at 32-33.  While United States v. McKeon dealt with admitting

prior statements that defense counsel has made, the Second Circuit has subsequently applied these

same restrictions in cases where a defendant sought to use prior statements from a government

attorney.  See United States v. Salerno, 937 F.2d 797, 811-12 (2d Cir. 1991), amended on other

grounds 952 F.2d 624, rev'd on other grounds 505 U.S. 317 (1992).

While the Tenth Circuit has not expressly disagreed with the limitations that the Second

Circuit imposed in United States v. McKeon, it has stated: "We express some doubt as to the legal

value of McKeon's procedural safeguards."  United States v. Pursley, 577 F.3d 1204, 1226 (10th

Cir. 2009).  It further criticized this decision when it said:

> Indeed, we note that the Federal Rules of Evidence seem to provide ample protection
> to guard against the prejudice that may accompany the admission of a prior jury
> argument.  Fed. R. Evid. 401 (defining "relevant evidence"); Fed. R. Evid. 403
> (noting that relevant evidence may be "excluded if its probative value is substantially
> outweighed by the danger of unfair prejudice").

United States v. Pursley, 577 F.3d at 1226.  The Tenth Circuit declined to decide whether it would

follow the Second Circuit.  See United States v. Pursley, 577 F.3d at 1226 ("Ultimately, however,

we need not decide whether to adopt the Second Circuit's approach in McKeon.").  Notably, the

Tenth Circuit characterized the procedural safeguards in United States v. McKeon as an embodiment

of "various practical and constitutional concerns" as opposed to any restriction that the Federal

Rules of Evidence impose.  United States v. Pursley, 577 F.3d at 1226.

Other courts have criticized the approach in United States v. McKeon.  One of the most

thorough critiques of this Second Circuit decision comes from a decision by the Honorable Dean

D. Pregerson, United States District Judge for the Central District of California.  See United States

v. Bakshinian, 65 F.Supp.2d 1104, 1105-09 (C.D. Cal. 1999)(Pregerson, J.).  Judge Pregerson

concluded that the United States is a party opponent within the definition of rule 801(d)(2)(A) and

rejected, in light of the Federal Rules of Evidence, "the common law principle that no individual

should be able to bind the sovereign."  United States v. Bakshinian, 65 F.Supp.2d at 1105.  Judge

Pregerson criticized a Seventh Circuit decision that reached a contrary holding and followed two

other circuit court decisions that concluded that this rule does apply to the United States.  See United

States v. Bakshinian, 65 F.Supp.2d at 1105 (citing United States v. Zizzo, 120 F.3d at 1351 n.4).

Judge Pregerson further noted that, unlike a typical government employee, "government prosecutors

have the power to bind the sovereign."  United States v. Bakshinian, 65 F.Supp.2d at 1105.  While

Judge Pregerson noted that the five policy concerns outlined in United States v. McKeon may have

some relevance when defense counsel's opening statement or closing argument is used against the

defendant in a subsequent trial, he rejected the concept that these policy considerations were as

significant when a defendant seeks to use the same evidence against the government.  See United

States v. Bakshinian, 65 F.Supp.2d at 1107-08.  Specifically, Judge Pregerson recognized:

> Upon consideration of McKeon's reasoning, it is clear that much of its analysis is restricted to the use of a defendant's prior statements and is thus inapplicable to prior statements of the government. For example, while the possibility of wasting time would apply to the defendant and the government alike, the possibility that the jury will be misled as to the government's burden applies only to the defendant.  McKeon noted that because the government bears the burden of proving every element of the offense, the defense need not attack each element in each proceeding and can instead focus only on certain weaknesses.  This may mislead the jury.  The government, however, cannot rely on this argument: it bears the burden of proving every element in every proceeding.  Therefore, if the government's prior statement weakens its present case as to a certain element, the government cannot complain that the jury may misunderstand the government's burden.
>
> McKeon also noted that the admission of prior arguments may deter "vigorous and legitimate advocacy."  Again, this argument applies only to the defendant.  Because the burden of proof is on the government, the defendant need only argue that the government has not met that burden and that something other than the government's theory might have actually occurred.
>
> Thus, while the defense may not make false statements to the jury, it is entitled to greater leeway than the government because the defense need not prove anything.  The government, however, bears the burden of convincing the jury that particular facts occurred and, moreover, between one trial and another, the government may not take inconsistent positions as to what occurred.  Thus, the fact

that the government's statements in a previous trial might be admitted in a later trial will not hinder proper advocacy by the government.

Finally, McKeon identified important rights that could be hampered by admitting all prior arguments by a defendant, rights such as the right against self-incrimination, the right to counsel of one's choice, and the attorney-client privilege. The government does not enjoy Fifth Amendment rights, it does not have a constitutional right to counsel, and while it enjoys attorney-client privilege, the burden on the government's privilege is not as harmful as the burden on that of a criminal defendant.

United States v. Bakshinian, 65 F.Supp.2d at 1107-08 (citations omitted). Ultimately, Judge

Pregerson declined to adopt the procedural safeguards in United States v. McKeon, and concluded

that the rules governing admissions by party opponents as well as rules 401 and 403 of the Federal

Rules of Evidence provide sufficient safeguards to admission of this evidence. See United States

v. Bakshinian, 65 F.Supp.2d at 1108-10.

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is

substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

evidence." Fed. R. Evid. 403. Under rule 403, the trial court must weigh the proffered evidence's

probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d

1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially outweighing probative

value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468

F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir.

1991)). The Tenth Circuit has recently reminded district courts that they should be "mindful" that

"exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an

extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787

(10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).  As the Supreme Court recently noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 S. Childress & M. Davis, Federal Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999).  Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 543 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 453 F.3d at 1301 (quoting

-26-

Fed. R. Evid. 403 advisory committee note).

## ANALYSIS

The Court will not dismiss any claims in the Superseding Indictment on the basis that the charges create the potential for due-process violations. Because cumulative punishments for both Counts 1 and 2 would result in a double-jeopardy violation, the Court will ensure that the jury instructions inform the jury that they may not convict Ganadonegro on both Counts 1 and 2. The Court will not, however, dismiss any Counts or require the United States to elect certain Counts to present at trial. Because the United States' statements in the previous trial are admissions by party opponents, the Court will permit Ganadonegro to use the one statement he has informed the Court he plans to use as evidence in the upcoming trial. Ganadonegro should not in any way mention or imply that there was a previous trial or that the statement was made to a jury. Any additional statements Ganadonegro seeks to offer from the prosecution's prior opening statement or closing argument will likewise be subject to the restrictions contained in rule 401 and 403 and must be pre-approved by the Court.

## I.   THE COURT WILL NOT DISMISS ANY OF THE COUNTS IN THE SUPERSEDING INDICTMENT ON THE BASIS THAT THEY VIOLATE GANADONEGRO'S DUE PROCESS RIGHTS.

Some courts have recognized that due process prevents the prosecution from presenting inherently factually contradictory theories in different criminal trials. See Smith v. Groose, 205 F.3d at 1052. The Court has not located any Tenth Circuit or Supreme Court precedent that directly addresses this topic. This due-process restriction, however, even if available under Tenth Circuit and Supreme Court precedent, applies only in limited circumstances, and almost exclusively in cases involving multiple defendants. Smith v. Groose, 205 F.3d at 1051-52. Courts have taken a realistic approach to applying these due process restrictions given the facts of a particular case. Courts

presented with situations where there are genuine evidentiary disputes as to who was responsible for a crime among various defendants have shown greater willingness to permit a prosecutor to argue inconsistent theories in separate trials.  See Beathard v. Johnson, 177 F.3d at 348; Parker v. Singletary, 974 F.2d at 1578.  Additionally, new evidence or new developments in a case can sometimes justify inconsistent theories at the trials of multiple defendants.  See Nguyen v. Lindsey, 232 F.3d at 1240-41.

Ganadonegro has not cited any authority where a court has found a due-process violation in factual circumstances similar to those in this case.  The United States is not attempting to argue, as part of one proceeding, that one person killed Q.S., and then turn around and argue in this proceeding that Ganadonegro killed her.  Cases with that factual pattern present a more compelling argument for a due-process violation in the absence of some justification for the prosecution's inconsistent arguments in each defendant's case.  It is undisputed that the United States has not prosecuted anyone else for Q.S.'s death.  Additionally, there are no indications that the United States intends to present evidence at the upcoming trial that is materially different from the evidence it presented at the previous trial.  Ganadonegro conceded at the hearing on February 2, 2012, that there would be no material factual inconsistency in the United States' upcoming presentation of its case compared to that in the previous trial.  See Tr. at 38:14-19, 39:12-25 (Pori).  Putting aside the issue of a double-jeopardy violation, Ganadonegro has not presented to the Court any authority standing for the proposition that a due-process violation occurs in cases where both trials involve the same defendant, when the prosecution proceeds at a subsequent trial on a theory that relies upon a different mens rea than the theory it asserted at a previous trial that ended in mistrial.  None of the authority Ganadonegro cites regarding a due-process violation involves a factual pattern where there is only one defendant.  When the United States proceeds in this manner, there is no "use of

-28-

inherently factually contradictory theories," which some courts have held "violates the principles of due process."  Smith v. Groose, 205 F.3d at 1051-52.  While it may be more confusing for the jury to have to address several Counts as opposed to one, Ganadonegro has not articulated a legal basis that prevents the United States from proceeding on all these Counts.  That the charge presented to the jury at the upcoming trial may be confusing to the jury is irrelevant unless Ganadonegro can articulate a reason why doing so is legally impermissible.

Furthermore, the Court sees no reason to extend the holding of these due process cases to the current factual scenario.  "Any lawyer who has ever tried a case knows that trial preparation is not a static process."  Nguyen v. Lindsey, 232 F.3d at 1240-41.  Additionally, the Court does not conclude that the prosecution's reevaluation of the theory of its case in light of a mistrial amounts to a due process violation.  This case is not one where the prosecution plans to "essentially ridicule[] the theory [it] had used to obtain a conviction" at another defendant's trial.  Nguyen v. Lindsey, 232 F.3d 1236, 1240-41.  The United States has not yet secured a conviction against any defendant in relation to the death of Q.S.  Because the last case ended in a mistrial when the jury could not reach a unanimous verdict, none of the jury's findings are binding or have any effect on the subsequent trial.  The United States Constitution requires that, at least in federal court, a jury verdict be unanimous in a criminal case.  See Maxwell v. Dow, 176 U.S. 581, 586 (1900)(requiring "an unanimous verdict of twelve jurors in all Federal courts" in criminal trials), abrogated on other grounds by Williams v. Florida, 399 U.S. 78 (1970).  Consequently, the Court declines to adopt Ganadonegro's due process argument.

At least based on the results of the previous trial, the United States appears to have overcharged Ganadonegro by seeking to convict him of first degree murder.  Some jurors did not believe that Ganadonegro intentionally or knowingly committed child abuse.  The jurors represented

that it was undisputed that Ganadonegro killed Q.S.  The Court then cannot say that the United

States' theory lacked any basis in the law or in the facts of the case.  The law should not penalize

the United States for losing the first trial, learning from it, and re-charging the defendant with a less

serious crime or one that has a lower mens rea requirement.  The United States has followed the

proper procedures, and the Court does not see any fundamental inconsistency with how they have

proceeded in the previous trial and how they plan to proceed in the upcoming trial.

## II.   THE COURT WILL NOT DISMISS ANY OF THE COUNTS IN THE SUPERSEDING INDICTMENT OR REQUIRE THE UNITED STATES TO ELECT A THEORY ON WHICH IT WILL PROCEED AT TRIAL, BUT WILL NOT PERMIT THE UNITED STATES TO SECURE A CONVICTION ON BOTH COUNTS 1 AND 2.

The Tenth Circuit's "jurisprudence establishes that multiplicitous sentences violate the

Double Jeopardy Clause." United States v. McCullough, 457 F.3d at 1162 (internal quotation marks

omitted).  "Multiplicity refers to multiple counts of an indictment which cover the same criminal

behavior." United States v. McCullough, 457 F.3d at 1162.  "Although multiplicity is not fatal to

an indictment, multiplicitous counts which may result in multiplicitous convictions are considered

improper because they allow multiple punishments for a single criminal offense." United States v.

McCullough, 457 F.3d at 1162 (internal quotation marks omitted).

The issue of multiplicity may also arise when the defendant is charged with violations of

multiple criminal statutes for the same underlying acts or omissions.  See United States v. Patterson,

760 F.Supp.2d at 1120.  When confronting such a situation, courts employ a two-step test: "A person

may be prosecuted for more than one crime based on the same conduct (1) if each crime requires

proof of a fact that the other does not, or (2) if Congress has clearly expressed its intent to impose

cumulative punishment for the same conduct under different statutory provisions." United States

v. Pearson, 203 F.3d at 1267-68 (citations omitted).  When, as is often the case, there is no clearly

discernible congressional intent to impose cumulative punishment, courts use the rule of statutory construction described in Blockburger v. United States.  See United States v. Greene, 239 F.App'x at 436.

The Blockburger v. United States rule is often known as the "same elements test."  United States v. Pearson, 203 F.3d at 1268.  "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  Blockburger v. United States, 284 U.S. at 304.  "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."  Blockburger v. United States, 284 U.S. at 304 (internal quotation marks omitted).

As the Supreme Court has noted in the related context of determining when a jury instruction for a lesser-included offense may be given, an elements test is "certain and predictable . . . . [b]ecause the elements approach involves a textual comparison of criminal statutes and does not depend on inferences that may be drawn from evidence introduced at trial."  Schmuck v. United States, 489 U.S. at 720.  See United States v. Greene, 239 F.App'x at 436 (discussing Schmuck v. United States in context of the Blockburger v. United States test).  The Supreme Court has clarified, however, that the Blockburger v. United States test applies only to charges or convictions asserting violations of separate statutes and not to separate subsections of the same criminal provision.  See Sanabria v. United States, 437 U.S. at 70 n.24 (noting that the Blockburger v. United States test is used "to determine whether a single transaction may give rise to separate prosecutions, convictions, and/or punishments under separate statutes").

The Superseding Indictment contains the following three charges: (i) second-degree murder in violation of 18 U.S.C. § 1111; (ii) voluntary manslaughter in violation of 18 U.S.C. § 1112; and (iii) negligent child abuse resulting in death in violation of N.M.S.A. 1978, § 30-6-1(D)(1) and 18 U.S.C. § 13.  See Superseding Indictment at 1-2.[3] 18 U.S.C. § 1111 provides with respect to second-degree murder: "Murder is the unlawful killing of a human being with malice aforethought."  18 U.S.C. § 1111(a).  18 U.S.C. § 1112(a) provides with respect to voluntary manslaughter: "Manslaughter is the unlawful killing of a human being without malice.  It is of two kinds: Voluntary -- Upon a sudden quarrel or heat of passion."  18 U.S.C. § 1112(a).  18 U.S.C. § 13 provides as it applies to the charge in Count 3:

> Whoever within [Indian country] is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within [New Mexico], by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13.  N.M.S.A. 1978, § 30-6-1(D)(1) provides: "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health."  N.M.S.A. 1978, § 30-6-1(D)(1).

The elements of an offense under 18 U.S.C. § 1111(a) are as follows: (i) unlawful killing; (ii) of a human being; (iii) with malice aforethought; and (iv) causation.  See 18 U.S.C. § 1111(a).[4]

---

[3]All of the Counts rely on 18 U.S.C. § 1153 or 18 U.S.C. § 13, because the alleged offenses were committed on Indian country.  See Superseding Indictment at 1-2.  Consequently, the Court will not address those jurisdictional elements in its double-jeopardy analysis, since they are all identical.

[4]The Tenth Circuit Pattern Criminal Jury Instructions provide the following elements for second-degree murder: (i) "the defendant caused the death of the victim named in the indictment;" (ii) "the defendant killed the victim with malice aforethought;" and (iii) "the killing took place within the [territorial] [special maritime] jurisdiction of the United States."  Tenth Circuit Pattern

The elements of an offense under 18 U.S.C. § 1112(a) are as follows: (i) unlawful killing; (ii) of a

human being; (iii) without malice and upon a sudden quarrel or heat of passion; and (iv) causation.[5]

See 18 U.S.C. § 1112(a).  As charged in the Superseding Indictment,[6] Count 3 has the following

elements: (i) causing or permitting; (ii) a child; (iii) to be placed in a situation that causes the child's

death; (iv) which is a situation that the defendant knew or should have known would endanger the

child's life or health; (v) and that the defendant acted in reckless disregard to the child's life or

health in placing the child in the situation that caused its death.  See N.M.S.A. 1978, § 30-6-1(A)(3),

(D)(1), (F).[7]  Notably, an offense can be committed under this statute without killing the child,

---

Jury Instructions Criminal § 2.53, at 181 (2011)(Murder in the Second Degree).  Malice aforethought "means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life."  Tenth Circuit Pattern Jury Instructions Criminal § 2.53, at 181.

[5]The Tenth Circuit Pattern Criminal Jury Instructions provide the following elements for voluntary manslaughter: (i) "the defendant killed [the victim named in the indictment];" (ii) "the defendant acted unlawfully;" (iii) "while in [sudden quarrel] [heat of passion], and therefore without malice, the defendant: (a) intentionally killed [the victim named in the indictment];" (b) "intended to cause [the victim named in the indictment] serious bodily injury; or (c) acted recklessly with extreme disregard for human life;" and (iv) "the killing took place within the [territorial] [special maritime] jurisdiction of the United States."  Tenth Circuit Pattern Jury Instructions Criminal § 2.54, at 183 (Murder in the Second Degree).

[6]Count 3 in the Superseding Indictment uses somewhat different phrasing and structure than what appears in N.M.S.A. 1978, § 30-6-1(D)(1) and the applicable uniform jury instruction.  The Court expresses no opinion on the propriety of the United States charging the crime in this manner except to comment that the jury charge ultimately submitted to the jury may contain the elements in a different order or with slightly different phrasing than what appears in the Superseding Indictment.

[7]The Court sets out the elements in the most logical manner for discussion and to make them track the statute and the applicable uniform jury instruction; it does not intend to set out the elements as they may ultimately appear in the charge.  In relation to the crime as charged in the Superseding Indictment, the New Mexico Uniform Jury Instructions provide the following elements for this offense: (i) that the defendant caused the child to be placed in a situation which endangered the life or health of the child; (ii) that the defendant acted with reckless disregard and without justification; (iii) that the defendant's actions or failure to act resulted in the death of the child; (iv) that the victim

although the death of a child results in a more serious potential sentence.  See N.M.S.A. 1978, § 30-6-1 (D)(1), (F).

Count 1, charging second-degree murder, and Count 2, charging voluntary manslaughter, are multiplicitous to the extent that cumulative punishment for both would result in a double-jeopardy violation.   The Supreme Court has recognized that the "Fifth Amendment forbids . . . cumulative punishment for greater and lesser included offenses."  Brown v. Ohio, 432 U.S. 161, 169 (1977).  The Tenth Circuit has recognized that voluntary manslaughter is a lesser included offense of second-degree murder.  See United States v. Serawop, 410 F.3d 656, 660, 662, 664-66 (10th Cir. 2005)("The district court instructed the jury on second degree murder and the lesser included offenses of voluntary and involuntary manslaughter."); United States v. Scafe, 822 F.2d 928, 933 (10th Cir. 1987)("Voluntary manslaughter is a lesser included offense of murder."). See also Moore v. Hayes, 156 F.3d 1231, 1998 WL 432474, at *1 (6th Cir. 1998)(unpublished table decision)("Since Moore had already been acquitted of second-degree murder, the Double Jeopardy Clause would prohibit a retrial of Moore [on the voluntary-manslaughter charge], and the reversal therefore effectively ended the prosecution.").  Cf. Price v. Georgia, 398 U.S. 323, 324, 329-31 (1970)(finding retrial for first-degree murder to be inappropriate on double-jeopardy grounds following a jury verdict of guilty on a charge of voluntary manslaughter).  More specifically, the Tenth Circuit has stated that a "jury's guilty verdict on the lesser included offense of voluntary manslaughter constitute[s] an implicit acquittal on the charge of second degree murder."  United

---

was under the age of eighteen; and (v) that the offense happened in New Mexico on or about the time charged in the indictment.  See N.M.R.A. 14-602 UJI (2011).  The New Mexico Uniform Jury Instructions further define reckless disregard as follows: (i) the defendant knew or should have known that his or her conduct created a substantial and foreseeable risk; (ii) the defendant disregarded that risk; and (iii) the defendant was wholly indifferent to the consequences of the conduct and to the welfare and safety of the child.  See N.M.R.A. 14-602 UJI.

States v. Brown, 287 F.3d 965, 977 n.7 (10th Cir. 2002).  In part because of these double-jeopardy restrictions, however, courts frequently present to the jury a charge containing lesser included offenses and instruct the jury that they may not convict the defendant of both of those offenses and can eliminate any danger of multiplicitous convictions with proper instructions in the jury charge. See United States v. Serawop, 410 F.3d at 660; Williams v. Scott, 39 F.3d 320, 1994 WL 612743, at *7 (5th Cir. 1994)(unpublished table decision)("Because the judge explicitly instructed the jury to consider these charges alternatively, there was absolutely no danger that Williams would receive more than one sentence (or conviction) for the same offense."); United States v. Luskin, 926 F.2d 372, 374-75, 377 (4th Cir. 1991)("Admittedly, our law permits the prosecutor to carve up criminal conduct into many counts so that technical problems with the evidence will not allow the true criminal to walk free.").  Additionally, courts have discretion in permitting multiplicitous counts to go to the jury and then to vacate, as necessary, any multiplicitous convictions following the trial. See United States v. Johnson, 130 F.3d at 1426.  If the jury does not follow the Court's instructions, the district court can send the jury back for further deliberations so that they properly follow the instruction or vacate one of the convictions.  See United States v. Barrett, 496 F.3d at 1095; Williams v. Scott, 1994 WL 612743, at *7.  The Court will permit the United States to proceed to trial on both of these charges, but will not permit Ganadonegro to receive a conviction for both offenses.[8]  The Court will instruct the jury that it cannot convict Ganadonegro on both Counts 1 and

---

[8]Notably, a conviction for both second-degree murder and voluntary manslaughter for the same underlying conduct would result in a legally inconsistent jury verdict, as second-degree murder requires that the offense be committed with malice while voluntary manslaughter requires that the offense be committed without malice.  See United States v. Serawop, 410 F.3d at 662, 664-66 ("The presence or absence of malice marked the boundary which separated the crimes of murder and manslaughter.  Today, malice still distinguishes federal murder from federal manslaughter." (citations omitted)).

2.  Under no circumstances will the Court permit cumulative punishment for both of these Counts.

Count 1 and Count 3 are not multiplicitous.  Count 1 requires committing: (i) an unlawful killing; and (ii) doing so with malice aforethought.  See 18 U.S.C. § 1111(a).  Acting with malice aforethought is an additional fact that the prosecution does not need to prove under N.M.S.A. 1978, § 30-6-1(D)(1).  See N.M.S.A. 1978, § 30-6-1(D)(1).  As charged in the Superseding Indictment, Count 3 has the following elements: (i) causing or permitting; (ii) a child; (iii) to be placed in a situation that causes the child's death; (iv) which is a situation that the defendant knew or should have known would endanger the child's life or health; (v) and that the defendant acted in reckless disregard to the child's life or health in placing the child in the situation that caused its death. N.M.S.A. 1978, § 30-6-1(A)(3), (D)(1), (F).  The following elements are additional facts that the United States does not need to prove under 18 U.S.C. § 1111(a): (i) committing the offense against a child, defined by statute as a person less than eighteen years of age, see N.M.S.A. 1978, § 30-6-1(D)(1); (ii) that the defendant knew or should have known his conduct would endanger the child's life or health; and (iii) that the defendant acted in reckless disregard to the child's life or health by placing the child in the situation that cause its death.  Furthermore, child abuse resulting in death is not a lesser included offense of second-degree murder, because the offense is not "necessarily committed in carrying out of the greater crime."  Black's Law Dictionary 1187 (9th ed. 2009).  They contain distinct mens rea requirements, with the New Mexico offense requiring only criminally negligent conduct, N.M.S.A. 1978, § 30-6-1(A), (D)(1), and with second-degree murder requiring that the defendant act "deliberately and intentionally, or . . . with callous and wanton disregard for human life."  Tenth Circuit Pattern Jury Instructions Criminal § 2.53, at 181.  Furthermore, child abuse resulting in death requires a specific victim -- a child.

Count 2 and Count 3 are not multiplicitous.  Count 2 requires proof that the defendant

-36-

commit the killing upon a sudden quarrel or heat of passion.  See 18 U.S.C. § 1112(a).  Acting based

upon a sudden quarrel or heath of passion is an additional fact that the prosecution does not need

to prove under N.M.S.A. 1978, § 30-6-1(D)(1).  As charged in the Superseding Indictment, Count

3 has the following elements: (i) causing or permitting; (ii) a child; (iii) to be placed in a situation

that causes the child's death; (iv) which is a situation that the defendant knew or should have known

would endanger the child's life or health; (v) and that the defendant acted in reckless disregard to

the child's life or health in placing the child in the situation that caused its death.  N.M.S.A. 1978,

§ 30-6-1(A)(3), (D)(1), (F).  The following elements are additional facts that the United States does

not need to prove under 18 U.S.C. § 1111(a): (i) committing the offense against a child, defined by

statute as a person less than eighteen years of age, see N.M.S.A. 1978, § 30-6-1(D)(1); (ii) that the

defendant knew or should have known his conduct would endanger the child's life or health; and

(iii) that the defendant acted in reckless disregard to the child's life or health by placing the child

in the situation that cause its death.  Child abuse resulting in death is not a lesser included offense

of second-degree murder, because the offense is not "necessarily committed in carrying out of the

greater crime."  Black's Law Dictionary, supra, at 1187.  It is not necessary for there to be a sudden

quarrel or heat of passion to commit an offense under N.M.S.A. 1978, § 30-6-1(D)(1), which

permits a conviction based on criminal negligence.  In terms of mens rea, voluntary manslaughter

requires either intentional conduct or criminal recklessness -- both of which are greater mens rea

requirements than criminal negligence.  See Tenth Circuit Pattern Jury Instructions Criminal § 2.54,

at 183.  Likewise, child abuse resulting in death requires a specific victim -- a child.[9]

_____

[9]While none of the parties have raised this issue, it appears that a conviction under Count 1
and Count 3, or Count 2 and Count 3, would be legally consistent.  All three Counts permit a
conviction upon a showing of intentional and/or reckless conduct, although upon varying degrees
of reckless conduct.  The Tenth Circuit has held: "Reckless conduct, in the criminal context, is

The Court will permit the United States to proceed to trial on all three Counts.  Because cumulative punishment for both Counts 1 and 2 would result in a double-jeopardy violation, the Court will ensure that the jury instructions inform the jury that they may not convict Ganadonegro on both Counts 1 and 2.  The Court will not, however, dismiss any Counts or require the United States to elect certain Counts to present at trial.

## III.   SUBJECT TO THE LIMITS IN RULES 401 AND 403, THE COURT WILL PERMIT GANADONEGRO TO USE THE PROSECUTOR'S STATEMENTS FROM THE PREVIOUS TRIAL IN THE UNITED STATES' CLOSING ARGUMENT AS ADMISSIONS BY A PARTY OPPONENT.

Because the United States is a party for purposes of the admission by party opponent rule

and because attorneys in the Department of Justice are the United States' agents, the Court

---

considered a form of intentional conduct because it 'includes an element of deliberateness -- a conscious acceptance of a known, serious risk.'"  United States v. Serawop, 410 F.3d at 663 n.4 (emphasis added).  The Tenth Circuit has recognized that the required degree of recklessness for both second-degree murder and voluntary manslaughter is the same, the difference being that second-degree murder requires that the crime be committed without malice as a result of adequate provocation:

> [V]oluntary manslaughter encompasses all of the elements of murder: it requires proof of the physical act of unlawfully causing the death of another, and of the mental state that would constitute malice, but for the fact that the killing was committed in adequately provoked heat of passion or provocation.  Thus, the only difference between second degree murder and voluntary manslaughter in the homicide hierarchy is that voluntary manslaughter is committed in the heat of passion, and the presence of this mitigating factor negates the malice that would otherwise attach given an intentional or reckless mental.

United States v. Serawop, 410 F.3d at 665.  Criminal negligence under New Mexico law has been defined as including "conduct which is reckless, wanton, or willful."  State v. Mascarenas, 129 N.M. 230, 233, 4 P.3d 1221, 1224 (2000).  In an analogous context, the Tenth Circuit has recognized that both second-degree murder and involuntary manslaughter encompass reckless behavior, with the difference being the degree of recklessness.  See Tenth Circuit Pattern Jury Instructions Criminal § 2.54.1 cmt., at 186 ("Second degree murder involves reckless and wanton disregard for human life that is extreme in nature, while involuntary manslaughter involves reckless and wanton disregard that is not extreme in nature." (citing United States v. Wood, 207 F.3d 1222, 1229 (10th Cir. 2000)).

concludes that the statements which the Assistant United States Attorney made during closing argument as part of the previous trial qualify as admissions by party opponents.  Because Tenth Circuit precedent indicates that the Tenth Circuit would not impose additional procedural safeguards outside those contained in the Federal Rules of Evidence and because doing so advances no sound policy goal, the Court will decline to apply the additional procedural safeguards some circuits have adopted.  The Court concludes that the statement Ganadonegro asserts he plans to offer at trial is admissible under rule 401 and 403 of the Federal Rules of Evidence.

### A.   THE UNITED STATES IS A PARTY UNDER RULE 801(d)(2).

The Tenth Circuit has not decided whether statements by government attorneys qualify as admissions by party opponents under rule 801(d)(2).  The Tenth Circuit has assumed without deciding "that the government's statements in a brief are admissible as the admission of a party opponent," but noted that "some courts have declined, for reasons of policy, to hold the government to the statements of its agents in criminal cases."  In re Antrobus, 563 F.3d at 1099 n.3.  Many circuits have recognized that, under the rules for admissions by party opponents, a defendant may admit statements that government attorneys and some other government agents make.  In the context of a government memorandum and government brief drafted in another case by an attorney in the Department of Justice, the First Circuit permitted the use in a separate criminal case of these statements by government attorneys as admissions by party opponent.  See United States v. Kattar, 840 F.2d at 126-27, 130-31.  The First Circuit stated:

> We first must determine whether the government is a "party-opponent" for purposes of this rule in a criminal case.  We agree with Judge Bazelon that "the Federal Rules clearly contemplate that the federal government is a party-opponent of the defendant in criminal cases."  We can find no authority to the contrary or reason to think otherwise.  Whether or not the entire federal government in all its capacities should be deemed a party-opponent in criminal cases, the Justice Department certainly should be considered such.

-39-

Kattar initially argues that the briefs in question contained admissions of "agents" of his party-opponent, and were therefore admissible under Rule 801(d)(2)(D). We need not deduce the scope of Rule 801(d)(2)(D), however, because the statements here were admissible under Rule 801(d)(2)(B) as statements of which the party-opponent "has manifested an adoption or belief in its truth." The Justice Department here has, as clearly as possible, manifested its belief in the substance of the contested documents; it has submitted them to other federal courts to show the truth of the matter contained therein. We agree with Justice (then Judge) Stevens that the assertions made by the government in a formal prosecution (and, by analogy, a formal civil defense) "establish the position of the United States and not merely the views of its agents who participate therein." The inconsistency of the government's positions about the Church should have been made known to the jury. The government cannot indicate to one federal court that certain statements are trustworthy and accurate, and then argue to a jury in another federal court that those same assertions are hearsay.

United States v. Kattar, 840 F.2d at 130-31 (footnotes omitted)(citations omitted)(quoting United States v. Morgan, 581 F.2d at 937 n.10; United States v. Powers, 467 F.2d at 1097 n.1 (Stevens, J., dissenting)).

The D.C. Circuit has similarly rejected arguments that the government is not a party opponent:

Notwithstanding the plain language of the Rule, the government urges us to hold it inapplicable to the prosecution in criminal cases. The government's position is based on public policy grounds, and has been accepted, it says, by the Courts of Appeals for the Second, Sixth, and Seventh Circuits. All of the cases on which it relies, however, save one, were decided before the Federal Rules of Evidence were made effective by Congress. And that one, United States v. Pandilidis, 524 F.2d 644 (6th Cir. 1975), decided several months after the effective date of the Rules, does not discuss their possible applicability. Moreover, there is nothing in the history of the Rules generally or in Rule 801(d)(2)(B) particularly to suggest that it does not apply to the prosecution in criminal cases.

United States v. Morgan, 581 F.2d at 937-38 (footnotes omitted). The Second Circuit "has recognized that the government's attorneys can bind the government with their in-court statements" under the rules for admissions by party opponents. See United States v. Yildiz, 355 F.3d at 82. In a somewhat different context than the rules regarding admissions by party opponents, the Fourth

-40-

Circuit has held: "Further, a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party." United States v. Blood, 806 F.2d at 1221. In comparison, the Seventh Circuit has stated: "Based on the common law principle that no individual should be able to bind the sovereign, we generally decline to apply Rule 801(d)(2) to statements made by government employees in criminal cases." United States v. Zizzo, 120 F.3d at 1351 n.4. The Seventh Circuit commented, however, "that a number of courts have rejected that approach when dealing with statements made by government attorneys." United States v. Zizzo, 120 F.3d at 1351 n.4.

Nearly every circuit court that has addressed the issue has concluded that the United States can qualify as a party under the admission by party opponent rule. Adhering to the common-law rule that the sovereign cannot be bound by its agents' statements would be unwise in light of the adoption of the Federal Rules of Evidence. The Federal Rules of Evidence abolished, modified, or took a position on many common-law evidence rules and principles, including those governing admissions by party opponents. See, e.g., Fed. R. Evid. 801(d)(2) advisory committee's note (taking a position on the scope of common law rules governing "the admissibility of statements by agents" based on "[d]issatisfaction with this loss of valuable and helpful evidence . . . increasing" and "[a] substantial trend favor[ing] admitting statements related to a matter within the scope of the agency or employment"); Huff v. White Motor Corp., 609 F.2d 286, 290-91 (7th Cir. 1979)(recognizing that the Federal Rules of Evidence govern the admissibility of "privity-based admissions" as opposed to the common-law rules governing admissibility of those statements).

One notable exception is that the Federal Rules of Evidence expressly left undisturbed common-law principles on privileges. See Fed. R. Evid. 501 (stating that "[t]he common law -- as interpreted by United States courts in the light of reason and experience -- governs a claim of

privilege unless" the United States Constitution, a federal statute, or Supreme Court rule provides otherwise).  Notably, that express preservation of the common law in some rules of evidence weighs in favor of a finding that the drafters of the Federal Rules of Evidence, as well as Congress who adopted them, intended to abolish the common-law rules on admissions by party opponents.  The rules of statutory construction apply to the Federal Rules of Evidence.  See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 163 (1988)("Because the Federal Rules of Evidence are a legislative enactment, we turn to the 'traditional tools of statutory construction' in order to construe their provisions." (citation omitted)).  In determining the meaning of a statute, courts look to the statute as a whole.  See United States v. Atl. Research Corp., 551 U.S. 128, 135 (2007).  When a statute includes particular language in one section of a statute, but omits it in another section of the same act, courts generally presume that the statute's drafter acted intentionally and purposefully in the including the language in one provision and omitting it from another.  See Burlington N. & Santa Fe. Ry. Co. v. White, 548 U.S. 53, 62-63 (2006).  Nothing in rule 801 of the Federal Rules of Evidence, the rule defining hearsay and nonhearsay, expresses an intent to preserve the common law.  In fact, the advisory committee notes to the various subsections in this rule express an intent to supplant many common-law hearsay principles.  See, e.g., Fed. R. Evid. 801(d)(1) advisory committee's note ("Prior inconsistent statements traditionally have been admissible to impeach but not as substantive evidence.  Under the rule they are substantive evidence.").  Thus, putting aside the issue whether a particular statement qualifies as an admission under rule 801(d)(2) or a particular person qualifies as the United States' agent under this rule, the Court concludes that the Federal Rules of Evidence do not preserve the common-law rule that the United States can never be a party

for purposes of admissions by party opponents.[10]

**B.** **THE PROSECUTOR'S STATEMENT IN CLOSING ARGUMENT AT GANADONEGRO'S PREVIOUS TRIAL QUALIFIES AS AN ADMISSION UNDER THIS RULE.**

While courts have had a more difficult time concluding whether a case agent or a government informant qualifies as an agent under rule 801(d)(2)(D), courts have almost uniformly concluded that government attorneys, including Department of Justice attorneys, are agents under this rule. As Judge Pregerson noted, unlike a typical government employee, "government prosecutors have the power to bind the sovereign." United States v. Bakshinian, 65 F.Supp.2d at 1105. Additionally, the issue is less complex when it comes to the Department of Justice as opposed to other federal agencies, which in many cases must rely on the Department of Justice to institute litigation, and have little or no authority to proceed independently in federal court. See, e.g., Rappanos v. United States, 547 U.S. 715, 789 (2004)(Stevens, J. dissenting)(noting that the Environmental Protection Agency referred a water dispute to the Department of Justice when it became necessary to proceed to federal court); United States v. Appel, 210 F.3d 385, 2000 WL 27878, at *3 (9th Cir. 2000)(unpublished table decision)("Appel continued to refuse to comply with the Order and continued to demand proof of federal jurisdiction over him, a 'Citizen of California.' After several subsequent warnings, the EPA referred the matter to the U.S. Department of Justice for civil prosecution, which is the subject of this appeal."). As the First Circuit explained: "Whether

---

[10]As the First Circuit explained, it is possible that some bodies or entities within the federal government would not necessarily qualify as a party under this rule of evidence. See United States v. Kattar, 840 F.2d at 130 ("Whether or not the entire federal government in all its capacities should be deemed a party-opponent in criminal cases, the Justice Department certainly should be considered such."). Given that the Court is dealing with representatives of the Department of Justice in this case, the Court does not find it necessary on the facts presented to decide whether every other federal agency would qualify as a party in criminal cases for purposes of this rule of evidence.

or not the entire federal government in all its capacities should be deemed a party-opponent in criminal cases, the Justice Department certainly should be considered such." United States v. Kattar, 840 F.2d at 130.

The Court concludes that treating government attorneys, particularly Department of Justice attorneys, as agents of the United States is the correct approach.  The Court notes that, in the civil context, attorneys must generally be careful with written or oral statements they make during litigation, as those statements may later be used against their client.  See, e.g., Rooms v. SEC, 444 F.3d 1208, 1213 (10th Cir. 2006)("A pleading prepared by an attorney is an admission, however, because the attorney presumably speaks for the litigant."); United States v. Blood, 806 F.2d at 1221 ("Further, a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party.").  Attorneys also have significant authority to concede a client's position and thus bind the client, in both the criminal and civil context.  See United States v. Ventura-Perez, No. 10-1529, 2012 WL 130716, at *7 (10th Cir. Jan. 18, 2012)("Courts could not function properly if concessions by counsel cannot be relied upon."). The United States has presented no persuasive arguments that would justify departing from this general rule that attorney's statements can bind the client.

There can be no dispute that the United States Attorney's Office, which is within the Department of Justice, has considerable discretion to decide how it prosecutes cases.  Congress has given the United States Attorney's Office the general power to prosecute all criminal offenses against the United States:

> Except as otherwise provided by law, each United States attorney, within his district, shall --
>
> (1)   prosecute for all offenses against the United States;

> (2)     prosecute or defend, for the Government, all civil actions, suits or proceedings in which the United States is concerned;
>
> (3)     appear in behalf of the defendants in all civil actions, suits or proceedings pending in his district against collectors, or other officers of the revenue or customs for any act done by them or for the recovery of any money exacted by or paid to these officers, and by them paid into the Treasury;
>
> (4)     institute and prosecute proceedings for the collection of fines, penalties, and forfeitures incurred for violation of any revenue law, unless satisfied on investigation that justice does not require the proceedings; and
>
> (5)     make such reports as the Attorney General may direct.

28 U.S.C. § 547.  "With a few exceptions, the United States Attorneys have been delegated the authority to make [many] important and sensitive decisions that drive criminal prosecutions." United States v. Giangola, No.07-706, 2008 WL 3992138, at *4 (D.N.M. May 12, 2008)(Browning, J.).  The Supreme Court has likewise broadly deferred to prosecutors' discretion to determine how to proceed in a criminal case:

> In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.  Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" so long as "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."  To hold that the prosecutor's desire to induce a guilty plea is an "unjustifiable standard," which, like race or religion, may play no part in his charging decision, would contradict the very premises that underlie the concept of plea bargaining itself.  Moreover, a rigid constitutional rule that would prohibit a prosecutor from acting forthrightly in his dealings with the defense could only invite unhealthy subterfuge that would drive the practice of plea bargaining back into the shadows from which it has so recently emerged.
>
> There is no doubt that the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse.  And broad though that discretion may be, there are undoubtedly constitutional limits upon its exercise.  We hold only that the course of conduct

-45-

engaged in by the prosecutor in this case, which no more than openly presented the
defendant with the unpleasant alternatives of forgoing trial or facing charges on
which he was plainly subject to prosecution, did not violate the Due Process Clause
of the Fourteenth Amendment.

Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)(footnotes omitted)(citations omitted).  For most

cases, "the prosecutorial discretion of the U.S. Attorney is vast and unchecked by any formal,

external constraints or regulatory mechanisms."  Richard S. Frase, The Decision to File Federal

Criminal Charges: A Quantitive Study of Prosecutorial Discretion, 47 U. Chi. L. Rev. 246, 303

(1980).

For those reasons, the United States Attorney's Office is, under rule 801(d)(2)(C), "a person

whom the party," the United States in this case, "authorized to make a statement on the subject."

Fed. R. Evid. 801(d)(2)(C).  Congress has expressly authorized the United States Attorney's Office

to prosecute crimes in federal courts and thus to speak on the United States' behalf on these matters

in a way that will bind the United States.  As the advisory committee note to rule 801(d)(2)(C)

contemplates, there is a principal-agent relationship between the United States and the United States

Attorney's Office for the purposes of prosecuting criminal matters -- which includes within the

scope of the agency making statements in federal court on those matters.  See Fed. R. Evid.

801(d)(2)(C) advisory committee's note (describing the relationship contemplated in rule

801(d)(2)(C) as a "principal" and "agent" relationship).  Under rule 801(d)(2)(D), the United States

Attorney's Office, based on its general agency relationship with the United States to prosecute

crimes, is "the party's agent or employee" who is capable of making statements "on a matter within

the scope of that relationship while it existed."  Fed. R. Evid. 801(d)(2)(D).  Statements in closing

argument regarding the defendant's guilt or innocence are a matter within the scope of the agency

relationship -- the prosecution of criminal offenses against the United States.  See Fed. R. Evid.

-46-

801(d)(2)(D); Rainbow Travel Serv., Inc. v. Hilton Hotels Corp., 896 F.2d 1233, 1242 (10th Cir. 1990)(recognizing that a shuttle bus driver's statement regarding a hotel's reservation practices was admissible under rule  801(2)(D), even though there was no evidence he was involved in making reservations, when the shuttle bus driver often transported hotel customers who had lost their reservations).  Additionally, under rule 801(d)(2)(B), the United States has "manifested that it adopted or believed to be true" these statements by presenting them in federal court before a jury to secure a conviction.  See Fed. R. Evid. 801(d)(2)(B); United States v. Kattar, 840 F.2d at 130-31 ("The Justice Department here has, as clearly as possible, manifested its belief in the substance of the contested documents; it has submitted them to other federal courts to show the truth of the matter contained therein.").

Lastly, the United States assertions' that its closing argument and opening statement from the previous trial are not evidence is unpersuasive.  While it is true that opening statements and closing arguments are not evidence as a general matter, see United States v. Rogers, 556 F.3d 1130, 1141 (10th Cir. 2009)("Moreover, the jury was properly instructed that closing arguments are not evidence and that Defendant should only be convicted on the basis of evidence submitted at trial."); Tenth Circuit Pattern Jury Instructions Criminal § 1.06, at 13 (2011)(Evidence -- Defined)("The lawyers' statements and arguments are not evidence."), the Tenth Circuit has recognized that a party may use an opponent's closing statements from a prior proceeding as an admission by party opponent:

> Under Rule 801(d)(2)(A) a party's own statement, when offered against him, is not hearsay.  Defendant asserts that the statements he made during the prior closing argument do not constitute admissions under Rule 801(d)(2)(A), because the purpose of closing argument is to persuade, not to express fact.  The district court rejected this argument, concluding that the statements were admissible admissions because they "represent an inculpatory interpretation of the kites from a person in the position to know what they meant."  We agree.  It is immaterial whether Defendant

was attempting to persuade the jury or to provide the jury with factual information.

United States v. McElhiney, 85 F.App'x 112, 115 (10th Cir. 2003)(unpublished).[11]  Likewise, whether a particular assertion in closing arguments was intended to convey factual information or simply to persuade the jury is irrelevant.  See United States v. McElhiney, 85 F.App'x at 115 ("It is immaterial whether Defendant was attempting to persuade the jury or to provide the jury with factual information.").

The Assistant United States Attorney's statement from its closing argument that "justice demands that you convict him of first degree, intentional child abuse because he shook her knowingly, intentionally, and willfully," Reply at 5-6, contains both factual assertions and legal conclusions.  The Tenth Circuit has encouraged "generous treatment" of admissibility when it comes to admissions by party opponents:

> Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule.  No guarantee of trustworthiness is required in the case of an admission.  The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from restrictive influences of the opinion rule and the rule requiring first-hand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for a generous treatment of this avenue of admissibility.

Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 667.  Consequently, the Court concludes that the prosecutor's statements from its prior closing argument qualify as admissions by a party opponent.  When a civil lawyer represents a client, the lawyer must take directions from the

---

[11]Based on this discussion in United States v. McElhiney, statements made during closing argument by an attorney would qualify as an admission by party opponent under rule 801(d)(2)(A), which encompasses statements "made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A).  Consequently, statements that the Assistant United States Attorney made in Ganadonegro's previous trial would also qualify as admissions by party opponent under rule 801(d)(2)(A).  See United States v. McElhiney, 85 F.App'x at 115.

client.  A prosecutor, however, often functions as the equivalent of both the client and the attorney.

The "public" is an amorphous client.  It is hard to imagine a closer relationship between the agent

and the principal than the one embodied by a prosecutor.  It does not appear unfair to hold a

prosecutor responsible for his or her own statements during a retrial.

### C.    THE COURT DECLINES TO ADOPT THE ADDITIONAL PROCEDURAL SAFEGUARDS FOR ADMISSION OF THIS EVIDENCE DISCUSSED IN UNITED STATES V. MCKEON AND WILL IMPOSE ONLY THE LIMITS OF RULE 401 AND 403 ON ITS ADMISSIBILITY.

The Tenth Circuit has not decided whether any additional procedural safeguards outside

those contained in the Federal Rules of Evidence would apply if a defendant sought to use a

prosecutor's statement in a previous trial in a subsequent trial in the same case.  Based on

indications in Tenth Circuit precedent that it would not impose additional procedural safeguards,

because these procedural safeguards lack any basis in the Federal Rules of Evidence, and because

they undercut the adversarial and truth-seeking purposes underlying the rules governing admissions

by party opponents, the Court concludes that the Tenth Circuit would not adopt these additional

procedural safeguards.  These additional procedural safeguards come primarily from the United

States v. McKeon decision from the Second Circuit.[12]

The Second Circuit in United States v. McKeon recognized "that prior opening statements

are not per se inadmissible in criminal cases," because "[t]o hold otherwise would not only invite

abuse and sharp practice but would also weaken confidence in the justice system itself by denying

the function of trials as truth-seeking procedures."  738 F.2d at 31.  It qualified this statement,

---

[12]While the Court is not confronted with the issue whether these procedural safeguards would apply if the prosecution sought to admit the defendant's prior closing argument, it notes that the Tenth Circuit has indicated in dicta that such restrictions would not apply in those circumstances. See United States v. Pursley, 577 F.3d at 1226.

however, when it said that it was "not willing . . . to subject such statements to the more expansive

practices sometimes permitted under the rule allowing use of admissions by a party-opponent."

United States v. McKeon, 738 F.2d at 31.  In adopting restrictions on the use of this evidence, the

Second Circuit expressed some skepticism towards the general policy behind the rule governing

admissions by party opponents:

> [W]e note that the admissions rule is itself something of an anomaly since it is in some respects an exception to the general proposition that probative value and reliability are the touchstone of the law of evidence where non-privileged matters are concerned. . . . Why probative value and reliability carry so little weight in the case of the admissions rule is not clear, particularly since the use of admissions may be the trial equivalent of a deadly weapon. In all probability, these aspects of the rule are derived vestigially from an older, rough and ready view of the adversary process which leaves each party to bear the consequences of its own acts, no matter how unreliable these acts may be as proof.

United States v. McKeon, 738 F.2d at 32.  As a safeguard on the use of these prior arguments

evidence, the Second Circuit imposed various restrictions on their use: (i) "the district court must

be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions

in a subsequent trial"; (ii) the district court must determine "that the statements of counsel were such

as to be the equivalent of testimonial statements" made by the client; and (iii) "the district court must

determine by a preponderance of the evidence that the inference that the proponent of the statements

wishes to draw 'is a fair one and that an innocent explanation for the inconsistency does not exist.'"

United States v. Ford, 435 F.3d at 215.  The Second Circuit has further held: "[S]peculations of

counsel, advocacy as to the credibility of witnesses, arguments as to the weaknesses in the

prosecution's case or invitations to a jury to draw certain inferences should not be admitted." United

States v. McKeon, 738 F.2d at 33.

While the Tenth Circuit has not expressly disagreed with the limitations the Second Circuit

has imposed in United States v. McKeon, it has stated: "We express some doubt as to the legal value

of <u>McKeon</u>'s procedural safeguards."  <u>United States v. Pursley</u>, 577 F.3d at 1226.  It further criticized this decision when it said:

> Indeed, we note that the Federal Rules of Evidence seem to provide ample protection to guard against the prejudice that may accompany the admission of a prior jury argument.  Fed. R. Evid. 401 (defining "relevant evidence"); Fed. R. Evid. 403 (noting that relevant evidence may be "excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

<u>United States v. Pursley</u>, 577 F.3d at 1226.  The Tenth Circuit expressly declined to decide whether it would follow the Second Circuit.  <u>See United States v. Pursley</u>, 577 F.3d at 1226 ("Ultimately, however, we need not decide whether to adopt the Second Circuit's approach in <u>McKeon</u>.").  Notably, the Tenth Circuit characterized the procedural safeguards in <u>United States v. McKeon</u> as an embodiment of "various practical and constitutional concerns" as opposed to any restriction that the Federal Rules of Evidence impose.  <u>United States v. Pursley</u>, 577 F.3d at 1226.

Other courts have criticized the approach in <u>United States v. McKeon</u>.  One of the most thorough critiques of this Second Circuit decision comes from a decision by Judge Pregerson from the Central District of California.  <u>See United States v. Bakshinian</u>, 65 F.Supp.2d at 1105-09.  While Judge Pregerson noted that the five policy concerns outlined in <u>United States v. McKeon</u> may have some relevance when the opening statement or closing argument of defendant's counsel is used against the defendant in a subsequent trial, he rejected the concept that these policy considerations were as significant when a defendant seeks to use the same evidence against the government.  <u>See United States v. Bakshinian</u>, 65 F.Supp.2d at 1107-08.  Specifically, Judge Pregerson recognized:

> Upon consideration of <u>McKeon</u>'s reasoning, it is clear that much of its analysis is restricted to the use of a defendant's prior statements and is thus inapplicable to prior statements of the government. For example, while the possibility of wasting time would apply to the defendant and the government alike, the possibility that the jury will be misled as to the government's burden applies only to the defendant.  <u>McKeon</u> noted that because the government bears the burden of proving every element of the offense, the defense need not attack each element in

each proceeding and can instead focus only on certain weaknesses. This may mislead the jury. The government, however, cannot rely on this argument: it bears the burden of proving every element in every proceeding. Therefore, if the government's prior statement weakens its present case as to a certain element, the government cannot complain that the jury may misunderstand the government's burden.

McKeon also noted that the admission of prior arguments may deter "vigorous and legitimate advocacy." Again, this argument applies only to the defendant. Because the burden of proof is on the government, the defendant need only argue that the government has not met that burden and that something other than the government's theory might have actually occurred.

Thus, while the defense may not make false statements to the jury, it is entitled to greater leeway than the government because the defense need not prove anything. The government, however, bears the burden of convincing the jury that particular facts occurred and, moreover, between one trial and another, the government may not take inconsistent positions as to what occurred. Thus, the fact that the government's statements in a previous trial might be admitted in a later trial will not hinder proper advocacy by the government.

Finally, McKeon identified important rights that could be hampered by admitting all prior arguments by a defendant, rights such as the right against self-incrimination, the right to counsel of one's choice, and the attorney-client privilege. The government does not enjoy Fifth Amendment rights, it does not have a constitutional right to counsel, and while it enjoys attorney-client privilege, the burden on the government's privilege is not as harmful as the burden on that of a criminal defendant.

United States v. Bakshinian, 65 F.Supp.2d at 1107-08 (citations omitted). Ultimately, Judge Pregerson declined to adopt the procedural safeguards in United States v. McKeon and concluded that the rules governing admissions by party opponents as well as rules 401 and 403 of the Federal Rules of Evidence provide sufficient safeguards to admission of this evidence. See United States v. Bakshinian, 65 F.Supp.2d at 1108-10.

While the Court may not be bound by Tenth Circuit dicta, the Court takes seriously anything that the Tenth Circuit says, at least as persuasive guidance. Cf. Bates v. Dep't of Corr. of State of Kan., 81 F.3d 1008, 1011 (10th Cir. 1996)("[A] panel of this Court is bound by a holding of a prior

panel of this Court but is not bound by a prior panel's dicta."). The Tenth Circuit's dicta from United States v. Pursley provides a strong indication of how the Tenth Circuit would likely decide this issue. Additionally, the Court believes that this dicta is persuasive and that adopting United States v. McKeon's procedural safeguards is unnecessary. The Tenth Circuit has indicated that it will encourage district courts to balance the relevant considerations under rule 403 when it comes to admission of prior closing arguments and opening statements. A district court has considerable discretion under rule 403 to permit or disallow the admission of problematic evidence in a particular case. See United States v. Lugo, 170 F.3d at 1005; United States v. Bice-Bey, 701 F.2d at 1089; United States v. Masters, 622 F.2d at 87-88. As the Supreme Court recently noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. at 384. Additionally, many opening statements and closing arguments from prior proceedings unrelated to the particular case would be irrelevant and thus inadmissible under rule 401. See Fed. R. Evid. 401.

The factors from United States v. McKeon have no basis in the Federal Rules of Evidence given the lenient rules regarding admissions by party opponents. While the Second Circuit spoke critically of these lenient rules in United States v. McKeon, the Tenth Circuit has encouraged "generous treatment" of admissibility when it comes to admissions by party opponents:

> Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from restrictive influences

of the opinion rule and the rule requiring first-hand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for a generous treatment of this avenue of admissibility.

Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 667.  While courts can adopt rules for situations that the Federal Rules of Evidence do not expressly contemplate, see, e.g., Ohler v. United States, 529 U.S. 753, 756 (2000)("Rule [103 of the Federal Rules of Evidence] does not purport to determine when a party waives a prior objection, and it is silent with respect to the effect of introducing evidence on direct examination, and later assigning its admission as error on appeal."), the Court believes that they should do so infrequently and avoid on an ad hoc basis imposing requirements on the admissibility of evidence that the rules of evidence do not contemplate.  Rule 403 provides a great deal of flexibility and can resolve many of the concerns the procedural safeguards in United States v. McKeon address.  Additionally, these procedural safeguards keep out what would in some cases be probative evidence that comes directly from a party's mouth.  Placing additional hurdles to the admission of this evidence would run counter to the policies behind the rule governing admissions by party opponents.  See Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 667.  Consequently, the Court declines to adopt the procedural safeguards outlined in United States v. McKeon.

**D.      THE COURT WILL PERMIT GANADONEGRO, UNDER RULE 401 AND 403, TO USE THE STATEMENTS TO WHICH HE HAS DIRECTED THE COURT FROM THE PROSECUTION'S PRIOR CLOSING ARGUMENT.**

Rule 401 provides: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time,

or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Under rule 403, the trial court

must weigh the proffered evidence's probative value against its potential for unfair prejudice. See

United States v. Record, 873 F.2d at 1375. "[I]t is only unfair prejudice, substantially outweighing

probative value, which permits exclusion of relevant matter [under rule 403]." United States v.

Pettigrew, 468 F.3d at 638. The Tenth Circuit has recently reminded district courts that they should

be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the

other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605

F.3d at 787 (10th Cir. 2010).

        The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's

discretion, see United States v. Lugo, 170 F.3d at 1005, and the trial court's discretion to balance

possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d

at 1089; United States v. Masters, 622 F.2d at 87-88. As the Supreme Court recently noted:

> In deference to a district court's familiarity with the details of the case and its greater
> experience in evidentiary matters, courts of appeals afford broad discretion to a
> district court's evidentiary rulings . . . . This is particularly true with respect to Rule
> 403 since it requires an "on-the-spot balancing of probative value and prejudice,
> potentially to exclude as unduly prejudicial some evidence that already has been
> found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. at 384. See United States v. Abel, 469 U.S. at

54 ("Assessing the probative value of [proffered evidence], and weighing any factors counseling

against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403

. . . .").

        Evidence may be unfairly prejudicial if it would likely provoke an emotional response from

the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter.

See United States v. Rodriguez, 192 F.2d at 951. Evidence is not unfairly prejudicial merely

because it damages a party's case.  See United States v. Caraway, 543 F.3d at 1301; United States v. Curtis, 344 F.3d at 1067; United States v. Martinez, 938 F.2d at 1082.  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 453 F.3d at 1301.

Ganadonegro has specifically asserted that he will put forward one statement from the United States' closing argument: "[J]ustice demands that you convict him of first degree, intentional child abuse because he shook her knowingly, intentionally and willfully."  Reply at 6.  Ganadonegro asserted that he would use these statements to illustrate that the United States has admitted that it was wrong in terms of the theory on which it proceeded at the first trial and that it could be wrong again.  See Tr. at 41:23-42:13 (Pori)("They can be wrong.  They admit they're wrong.  They know they were wrong before.").  Given how disputed Ganadonegro's mental state will be, particularly in light of the prior mistrial and the Superseding Indictment that charges several offenses with differing mental states, that the United States has changed position on Ganadonegro's mental state is a fact of consequence in determining the action.  See Fed. R. Evid. 401.  Ganadonegro will argue that the United States does not know what his mens rea was, and that the United States cannot prove a mens rea beyond a reasonable doubt.  Furthermore, this statement has a tendency to make the fact that he did not have a culpable mental state more probable than it would be without the evidence, or at least permits an inference to that effect.  See Fed. R. Evid. 401.  The standard for relevancy is particularly loose under rule 401, because "[a]ny more stringent requirement is unworkable and unrealistic."  Fed. R. Evid. 401 advisory committee's note.  Given the low threshold for relevancy, the Court concludes that this evidence is relevant.

Likewise, rule 403 does not counsel in favor of exclusion of this evidence.  The issue of Ganadonegro's mental state will be the focal point of the upcoming trial.  The jurors represented that

they deadlocked in the previous trial, because they could not agree whether the United States had proved Ganadonegro had the requisite mental state for commission of the offense.  The Court would be acting unfairly to Ganadonegro if it excluded evidence that might permit him to raise a reasonable doubt in the jury's mind whether he had the requisite mental state to commit the crime. Ganadonegro agreed that there was no reason for the jury to know about the previous jury trial or the mistrial, so the Court can limit what Ganadonegro says to prevent or to mitigate improper jury speculation.  While this evidence will be prejudicial to the United States, parties present evidence largely because it is favorable to their case and/or unfavorable to their opponent's case.  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."  United States v. Pettigrew, 468 F.3d at 638 (emphasis added).  The United States has failed to carry that burden to show that there is both unfair prejudice that would also substantially outweigh this evidence's probative value.

Furthermore, Ganadonegro has agreed to certain limits on the presentation of evidence that will avoid many of the United States' concerns about this upcoming trial transforming into a reexamination of the previous trial or an inquiry into the United States Attorney's Office's internal policies or charging decisions.  At the February 2, 2012 hearing, the Court asked for clarification whether Ganadonegro intended to read only statements the attorneys had made in closing argument, to which Ganadonegro responded that he planned to do so.  See Tr. at 41:1-8 (Court, Pori). Ganadonegro asserted that he would use these statements to illustrate that the United States has admitted that it was wrong in terms of the theory on which it proceeded at the first trial and that it could be wrong again.  See Tr. at 41:23-42:13 (Pori).  Ganadonegro agreed that he would not discuss that a previous trial occurred, that there was a mistrial, or what the division of the jury was.  See Tr. at 41:9-14 (Court, Pori).  He asserted that the jury should be able to consider this evidence.  See Tr.

at 42:14-21 (Pori).  The Court expressed hesitance in permitting Ganadonegro to assert that the jury concluded that the United States was wrong in proceeding on the previous theory.  See Tr. at 42:22-43:1 (Court).  Ganadonegro stated that he believes that he would be able to present this evidence without making an argument to the effect that the jury concluded the United States was wrong.  See Tr. at 43:1-19 (Pori).  Ganadonegro also represented that he would not call any prosecutors as witnesses, would not inquire into prosecutorial charging decisions, or let the prosecutors argue in favor of their own credibility in closing argument.  See Tr. at 61:5-10 (Pori).  The Court believes that Ganadonegro's representations regarding the manner in which he will present this evidence will help avoid the complications the United States predicts may occur.  The Court will also hold Ganadonegro to those representations.  If Ganadonegro pushes the limit too far and begins to delve into territory that is overly problematic or that might require explanation from the prosecution in a way that would require a prosecutor to testify, the Court will be receptive to an objection to that effect.  Any additional statements Ganadonegro seeks to offer from the prosecution's prior opening statement or closing argument will likewise be subject to the restrictions contained in rule 401 and 403 and must be pre-approved by the Court.  Ganadonegro is permitted to introduce as an exhibit the page from the transcript of the closing argument that contains the sentence he has asked the Court to permit him to introduce.  The rest of the closing argument on the page should be redacted. Ganadonegro should not mention or imply that the statement was made to a jury; he should say it was made to "the Court."  He should not mention or imply that there was a prior trial or the results of the trial.[13]

---

[13]At the hearing on February 2, 2012, the parties argued whether statements attorneys make in pre-trial proceedings would be admissible as admissions by party opponent.  Those facts are not before the Court, and the Court expresses no opinion on the admissibility of statements made in pretrial proceedings.

**IT IS ORDERED** that the Defendant's Motion to Dismiss, filed January 3, 2012 (Doc. 228), is granted in part and denied in part.  The Court will not dismiss any Counts in the Superseding Indictment or require the United States to elect some Counts on which it will proceed to trial.  The Court will permit Ganadonegro to admit one statement from the previous trial's closing arguments.  Ganadonegro should not in any way mention or imply that there was a previous trial or that the statement was made to a jury.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
   United States Attorney
Jennifer M. Rozzoni
Jeremy Pena
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Kari Converse
Brian A. Pori
   Assistant Federal Public Defenders
Federal Public Defender Office
District of New Mexico
Albuquerque, New Mexico

   *Attorneys for the Defendant*